```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF KANSAS
 2                      TOPEKA, KANSAS


 3

       UNITED STATES OF AMERICA,     )  ORIGINAL
 4     ------------------ Plaintiff,)
                                     )  Case No.
 5          vs.                      )  09-40041-JAR
                                     )
 6     ALFONSO RUBIO-AYALA,          )  App. No.
       ------------------ Defendant.)  11-3041
 7

 8           TRANSCRIPT OF SENTENCING HEARING

 9          PROCEEDINGS had before the Honorable

10     Julie A. Robinson, United States District

11     Court Judge, for the District of Kansas,

12     Topeka, Kansas, on the 24th day of January,

13     2011.


14

       APPEARANCES:
15
       For the Plaintiff:  Gregory G. Hough
16                         Asst. U.S. Attorney
                           290 U.S. Courthouse
17                         444 S.E. Quincy Street
                           Topeka, KS  66683
18
       For the Defendant:  Stephen W. Kessler
19                         Attorney at Law
                           3360 S.W. Harrison Street
20                         Topeka, KS  66611

21                         Alfonso Rubio-Ayala
                           Defendant
22
       Interpreter:        Marcella Renna
23
       Court Reporter:     Sherry A. Harris, C.S.R.
24

25
```

1                    I N D E X

2                  W I T N E S S

3

    TESTIMONY ON BEHALF OF PLAINTIFF          PAGE
4
    DOUGLAS GARMAN
5   Direct Examination by Mr. Hough              5
    Cross-Examination by Mr. Kessler            54
6   Redirect Examination by Mr. Hough           80
    Recross-Examination by Mr. Kessler          83
7   Redirect Examination by Mr. Hough           86

8

9                  E X H I B I T S

10      PLAINTIFF EX. NO.          OFFERED  RECEIVED

11      1                              48        48

12      2                              48        48

13      3                              48        48

14      5                              48        48

15      6                              48        48

16      7                              48        48

17      8                              48        48

18      9                              48        48

19      10                             48        48

20

21      Certificate --------------------------- 109

22

23

24

25

```
1                    PROCEEDINGS
2           THE COURT:  All right.  We're here
3      in United States versus Alfonso Rubio-Ayala,
4      09-40041.  We'll begin by swearing in
5      Ms. Renna, the court interpreter.
6                    (THEREUPON, Marcella Renna was
7      sworn in open court to interpret English into
8      Spanish and Spanish into English).
9           THE COURT:  And parties state your
10     appearances, please.
11          MR. HOUGH:  May it please the Court,
12     Your Honor, the government appears through
13     Assistant United States Attorney, Greg Hough.
14     I have with me for evidence today Task Force
15     Officer Doug Garman of the DEA.
16          MR. KESSLER:  Alfonso Rubio-Ayala
17     appears personally and with counsel, Steve
18     Kessler, Your Honor.
19          THE COURT:  All right.  We're here
20     for sentencing on Mr. Rubio-Ayala this
21     morning, and there are a number of objections
22     to the presentence report.  There is an
23     objection by Mr. Rubio-Ayala that he has not
24     received an adjustment for acceptance of
25     responsibility.  There is an objection to
```

1    receiving -- by the defendant -- to receiving

2    a two-point enhancement for possession of a

3    firearm.  There is an objection by the

4    defendant to a two-level increase for

5    importation of methamphetamine.  There is an

6    objection by the defendant to a four-level

7    increase for his role in the offense.  There

8    is an objection by the defendant to paragraph

9    33 of the presentence report.  Mr.

10   Rubio-Ayala says that he never went to the

11   house on North 57th Street in Kansas City,

12   Kansas, and wasn't aware of its existence.  I

13   believe that's it.

14           There are five objections,

15   Mr. Kessler.

16           Mr. Hough, I know you intend to put

17   evidence on.

18           But, Mr. Kessler, anything more you

19   would like to say before we hear from the

20   government witness?

21           MR. KESSLER:  No, Your Honor.  I

22   think the Court has set out what objections

23   we had to the presentence report.

24           THE COURT:  All right.

25           Mr. Hough.

1         MR. HOUGH:  Thank you, Judge.

2         THE COURT:  We'll swear in

3    Mr. Garman.

4              DOUGLAS GARMAN,

5    called as a witness on behalf of the

6    plaintiff, was sworn, and testified as

7    follows:

8              DIRECT EXAMINATION

9    BY MR. HOUGH:

10   Q.   Sir, would you please tell us your name and

11        your occupation?

12   A.   My name is Doug Garman.  I'm a Topeka police

13        officer assigned to the Drug Enforcement

14        Administration as a task force officer.

15   Q.   And in your official capacity, what were your

16        duties and responsibilities in the

17        investigation that gave rise to the

18        indictment in this matter?

19   A.   I was a co-case agent in the investigation,

20        one of the lead investigators.

21   Q.   And in that capacity did you participate in

22        and/or familiarize yourself with the

23        investigation in the form of the wiretaps and

24        the conversations?

25   A.   Yes, sir, I did.

```
 1    Q.    And also the statements and debriefings and
 2          proffers of those coconspirators that were
 3          indicted in this matter and ultimately
 4          changed their plea to guilty?
 5    A.    Yes, sir, I'm aware of those.
 6    Q.    Now, during the course of the investigation,
 7          did it become apparent through conversations
 8          that were recorded and the statements of
 9          coconspirators that firearms were involved in
10          and integral to this conspiracy?
11    A.    Yes, it was.
12    Q.    Could you describe for us how that evidence
13          came to light?
14    A.    The two leaders of the organization, Adan
15          Molina and Alfonso Rubi-Ayala, during the
16          course of the investigation, numerous
17          authorizations for interception of
18          communications were authorized.  So we
19          listened to many telephone calls and
20          conducted tremendous amounts of surveillance.
21                Through some of those intercepted
22          communications and telephone calls the
23          conversations were clear that Mr. Molina and
24          Mr. Ayala both possessed firearms in the
25          furtherance of this drug trafficking
```

```
1           conspiracy.

2                   Furthermore, they obtained firearms

3           from individuals for prior drug debts and

4           from a firearms trafficker from the Wichita,

5           Kansas, area.  Many of those firearms were

6           transported by vehicle to the Country of

7           Mexico.

8    Q.     And there were actual conversations recorded

9           that you have seen and heard between this

10          defendant and his co-leader, Molina,

11          regarding the firearms, correct?

12   A.     Yes, sir, there are.

13   Q.     Are there any that you have handy that you

14          could specifically point to?

15   A.     I have a few calls marked here, if you would

16          like.

17   Q.     Could you tell us date and time and content

18          of those?

19   A.     On December 17th of 2008 during the

20          interception of target phone 6, telephone

21          number 913-596-0014--

22                  THE COURT:  Could I get you to stop

23          for just a minute?  Tell me the date again.

24                  THE WITNESS:  I'm sorry, it's

25          December 17th of 2008.
```

```
 1                    THE COURT:  And it's target phone
 2          number 6?
 3                    THE WITNESS:  Yes, ma'am.
 4                    THE COURT:  913-596-0014?
 5                    THE WITNESS:  That is correct.
 6                    THE COURT:  Okay.
 7     A.    Investigators determined that Mr. Ayala was
 8           the user of that phone during that time.
 9                    In call number 539, a telephone
10           conversation with Adan Molina, they were
11           discussing money and an individual identified
12           as Ramisequis.
13                    THE COURT:  I'm sorry, who?
14                    THE WITNESS:  Ramisequis.
15                    THE COURT REPORTER:  Can you spell
16           it for me, Doug?
17                    THE WITNESS:  It's spelled
18           R-A-M-I-S-E-Q-U-I-S.
19     A.    During the context of the conversation,
20           Mr. Molina asked, quote, they just asked for
21           an ID to buy weapons?  And Rubio-Ayala
22           replied, "I think so, man."
23                    Continuing on December 21st of 2008,
24           the same telephone, the same telephone
25           number, again Mr. Ayala is utilizing the
```

```
 1            telephone, call number 876.  Mr. Ayala speaks
 2            with a female previously identified as
 3            Maricela.
 4                    THE COURT:  I'm sorry?  Maricela?
 5                    THE WITNESS:  M-A-R-I-C-E-L-A.
 6    A.      During the conversation Mr. Ayala tells her,
 7            quote, that he was going to buy a shit load
 8            of guns.  She replied that, "You're crazy.
 9            What you need them for?"  Mr. Ayala replied,
10            quote, to send them to Mexico to arm my
11            people.  The female again replied, "You're
12            crazy."  Mr. Ayala replied, "I don't have a
13            mess here.  I only have a machine gun 3," and
14            then a Mexican term in quotes, C-U-E-R-N-O-S.
15            And I'm trying to remember the translation of
16            that and I don't recall.
17                    He continues, "An AR-15 and like 15
18            guns.  The female asked, "And who is going to
19            take them?"  Mr. Ayala replies, "Ramiro."
20            The female asked, "And are they not going to
21            tell him anything on the road?"  Mr. Ayala
22            replies, "Well, he's going to take them in a
23            ocultado," a hidden compartment.
24                    Later the same day in call 881
25            Mr. Ayala and Molina have a conversation.
```

```
 1           During the conversation, they talk about
 2           meeting with, quote, the gun guy.  Molina
 3           told Rubio-Ayala, "And buy a shit load."  And
 4           Mr. Ayala replies, "All right."
 5    Q.     (By Mr. Hough)  Now, the Ramiro referenced in
 6           the call during the course of the
 7           investigation, did you identify who Ramiro
 8           was?
 9    A.     Yes, we did.
10    Q.     And who was Ramiro?
11    A.     Ramiro has tentatively been identified as
12           Ramiro Chavez from actually Newton, Kansas,
13           who is a firearms dealer.
14    Q.     Okay.  And the Ramiro that was going to take
15           the guns to Mexico referenced in the
16           conversation, would that be the same person?
17    A.     No, that is not.  That is a separate Ramiro.
18    Q.     And that would be who?
19    A.     The Ramiro that was going to transport the
20           firearms is Ramiro Soto, if I remember his
21           name correctly.  He's one of the
22           codefendants.
23    Q.     And Ramiro Soto pled guilty in this case?
24    A.     That is correct.
25    Q.     Was debriefed, correct?
```

1    A.    That is correct.

2    Q.    And during the course of that identified who

3          as the person or persons that were the

4          leaders in this organization?

5    A.    Yes, he did.

6    Q.    Would have been this defendant and Molina,

7          correct?

8    A.    That is correct.

9    Q.    Okay.

10               Now, based on your training and

11         experience, have you got a background or a

12         familiarization with drug traffickers

13         exporting firearms and/or ammunition to

14         Mexico?

15   A.    I'm not sure I understand the question.  Am I

16         familiar with it?

17   Q.    Yes.

18   A.    Yes, sir, I am.

19   Q.    And can you describe for us your training and

20         experience as it relates to Hispanic drug

21         traffickers in America exporting firearms,

22         ammunition, to Mexico?  Is it unusual?  Is it

23         in return for something else?  How does that

24         work?

25   A.    Well, traditionally narcotics trafficking

1          comes with firearms for most large-scale

2          trafficking organizations.  Initially they

3          use the firearms to protect their assets,

4          whether that's the controlled substances that

5          they're distributing, or the narcotics

6          proceeds that's been derived from the

7          distribution.

8                    Additionally, some traffickers

9          choose to use the weapons as a show of force

10         or fear towards other individuals who may owe

11         them a debt.

12                    Additionally, members, specifically

13         of the Hispanic trafficking organizations,

14         have recently, within the past few years,

15         known to me, begun to ship a large amount of

16         firearms and/or ammunition into the Country

17         of Mexico for the purpose of arming the drug

18         cartels, which in return are supplying the

19         controlled substances to the United States.

20         Mr. Ayala specifically states here that is

21         what the intent of at least some of these

22         weapons is, was to transport them to the

23         Country of Mexico.

24    Q.   And based on your training and experience,

25         organizations in America that obtain their

1           controlled substances from Mexico, do they

2           use firearms and ammunition sometimes as a

3           form of barter instead of currency to receive

4           additional supplies of controlled substances?

5    A.    Yes, that is common.  Obviously, firearms and

6           ammunition, if needed, do carry monetary

7           value in which people exchange items for.

8    Q.    Okay.

9                 Are there additional calls that you

10          can point us to that you identified there in

11          addition to those three?

12   A.    There are numerous calls, yes.  One I'd like

13          to point out occurs on December 24th of 2008.

14          This, again, is on target telephone number 6,

15          whose user was Mr. Alfonso Rubio-Ayala.  The

16          call number is identified as 1123 and the

17          conversation is between Mr. Ayala and Raymond

18          Chavez, one of his firearms distributors.

19                During the conversation, Raymond

20          asked, "This is Raymond, the man that sold

21          you the pistol.  The man that is working on

22          your pistol called me and said that he has to

23          replace the barrel on another part inside

24          where the trigger is"--

25                THE INTERPRETER:  May it please the

1          Court, the interpreter requests the witness

2          read more slowly.

3                    THE WITNESS:  I'm sorry, Your Honor.

4    A.    I'll start over.  "This is Raymond, the man

5          that sold you the pistol.  The man that is

6          working on your pistol called me and said

7          that he has to replace the barrel and another

8          part inside where the trigger is."  As the

9          conversation continued, Mr. Ayala and Ramon

10         continued to discuss working on the pistol.

11                   Later in the conversation Mr. Ayala

12         told Ramon, quote, well, if I have to wait, I

13         will wait.  But I want to send -- excuse

14         me -- but I want that pistol to be original

15         because I'm going to send that pistol to

16         Mexico.  As the conversation continued, Ramon

17         and Rubio-Ayala discussed the additional

18         weapons, ammunition, and magazines.

19                   That conversation led to another

20         conversation and surveillance action on

21         December 26th of 2008.  This conversation

22         again was intercepted on target phone 6,

23         utilized by Mr. Ayala.  The call number is

24         identified as 1240, and the telephone call is

25         between Mr. Ayala and Ramon Chavez.  During

1          the conversation, Ramon told Ayala, "I was

2          calling to see exactly what you wanted.  I

3          have 27 boxes of magazines for the," and it's

4          a Hispanic term, C-U-E-R-N-O, which is a

5          weapon, a type of a weapon, "and two .38s.

6          One is Winchester and the other is

7          Remington."

8                    During the rest of the conversation,

9          Ramon and Ayala continued discussing weapons

10         and ammunition.  At one point during the

11         conversation Ramon asked Ayala if he needed

12         any more weapons and Ayala replied, quote,

13         not for right now.  Wait until we send all of

14         those over there so that there won't be any

15         trouble.

16                    Following that conversation on or

17         about December 26th of 2008, additional

18         intercepts identified that Mr. Chavez and

19         Mr. Ayala were going to meet to exchange

20         firearms and ammunition.  I personally was

21         involved in the surveillance when this

22         occurred.  The meeting did occur at the

23         Wal-Mart on 37th Street in Topeka, Kansas.

24                    THE COURT:  And this is on

25         December 26th?

1            THE WITNESS:  I believe the

2      surveillance occurred on the 26th as well.

3      It was right around Christmas with this

4      telephone call.  There were additional calls

5      that arranged to meet.  I personally observed

6      Mr. Ayala meet with Mr. Chavez at the

7      Wal-Mart parking lot.

8            I further identified an ammunition

9      box known to me as a military style

10     ammunition box that is metal, it's

11     approximately 12 inches long and

12     approximately 4 to 5 inches wide and

13     approximately 8 to 10 inches deep, that the

14     military uses to store ammunition, often

15     found at gun shows, to contain ammunition

16     transfer from one vehicle to another, from

17     Mr. Chavez's vehicle to Mr. Ayala's vehicle.

18            Along with that container were

19     numerous other items, boxes.  They appeared

20     to be somewhat heavy by the way they were

21     holding on to them and setting them down into

22     the vehicle.  And then they went their

23     separate ways.

24            I believe that during that

25     surveillance that Mr. Chavez was supplying

```
 1            Mr. Ayala with the items discussed in this

 2            conversation, that being ammunition and

 3            magazines for firearms.

 4   Q.   (By Mr. Hough)  In the conversation, they

 5            specifically mention Winchester and

 6            Remington, correct?

 7   A.   Yes, sir, they did.

 8   Q.   Based on your training and experience, you

 9            know that Winchester and Remington are both

10            companies that manufacture ammunition for

11            firearms, correct?

12   A.   Yes, they do.

13   Q.   Okay.

14                Additional phone calls relative to

15            firearms enhancement that you have identified

16            that you could direct the Court to, sir?

17   A.   As I've stated, there are numerous calls

18            throughout the investigation, and there were

19            intercepts conducted for a period of

20            approximately nine months.  So we could

21            discuss numerous calls.  There are additional

22            calls where Mr. Molina and Ayala are shooting

23            firearms and there are additional calls

24            between Mr. Ayala and Gary Heath where Gary

25            Heath is obtaining and distributing firearms
```

1          to Mr. Ayala upon his request as well as with

2          other individuals.

3     Q.   Okay.  Gary Heath additionally was indicted

4          as a coconspirator and pled guilty, correct?

5     A.   Yes, that is correct.

6     Q.   And he cooperated with the government,

7          correct?

8     A.   Yes, sir, he has.

9     Q.   And during the course of his statements,

10         specifically indicated what, if anything,

11         relative to Mr. Rubio-Ayala and Mr. Molina

12         and their role or co-role in this offense?

13    A.   In a summary, and I haven't reviewed

14         Mr. Heath's statement for some time, but in a

15         summary Mr. Heath identified that he obtained

16         methamphetamine for an extended period of

17         time, as well as some marijuana, from both

18         Mr. Ayala and Mr. Molina.

19              Mr. Heath wasn't able to determine

20         who was actually above the other in this

21         organization.  He described them as being

22         equal partners in this trafficking effort.

23         He did state that it appeared that Ayala

24         handled more of the day-to-day operations, at

25         least in the Topeka, Kansas, area, as far as

1     distributing narcotics from them, primarily

2     methamphetamine, and collecting narcotics

3     proceeds from its customers.

4          However, Mr. Heath also described

5     many occasions, as did we on surveillance and

6     intercepts of communications, where

7     Mr. Molina supplied methamphetamine directly

8     to Gary Heath and collected money.

9          Additionally, Mr. Heath identified

10    other individuals as persons who would

11    distribute methamphetamine to him once he

12    contacted Mr. Molina or Mr. Ayala, that other

13    individuals at times would show up and

14    provide him with the methamphetamine that he

15    had requested from either Mr. Ayala or

16    Mr. Molina.  And at times he in turn would

17    provide them with payment for those

18    narcotics.

19          Additionally, Mr. Heath described

20    obtaining firearms and providing firearms to

21    both Mr. Ayala and Mr. Molina.  He did state

22    that he was oftentimes paid for the firearms

23    by them and not exchanged for a narcotics

24    debt or for narcotics itself but rather that

25    they would pay for it.

1          Additionally, I believe that he also

2      provided them with some ammunition as well.

3   Q.  Let me show you what's been caused to be

4      marked Government Exhibits 1 and 2.  Do you

5      recognize those as report of proffer and

6      debriefing statements of Gary Heath?

7   A.  Yes, sir, I do.

8   Q.  And among the things that Mr. Heath talks

9      about there include a conversation attributed

10     to Mr. Rubio-Ayala and Mr. Molina where they

11     talk about where their methamphetamine

12     ultimately was coming from; is that correct?

13     I believe it's in the second of the two,

14     Exhibit 2.

15  A.  Yes, I see references to the Country of

16     Mexico.  And, again, I haven't reviewed this

17     for quite some time.

18  Q.  Mr. Heath was shown the reports, Exhibits 1

19     and 2, prior to the commencement of the trial

20     in this case.  Do you recall that?

21  A.  Yes, sir, he was.

22  Q.  And that occurred in the presence of his

23     counsel, Don Hoffman, correct?

24  A.  Yes, sir, it did.

25  Q.  At that time did he indicate that the

1          contents of the reports were true and

2          accurate reports of his prior statements?

3     A.   Yes, that is true.

4     Q.   And in those reports of the statements he

5          attributes statements to this defendant that

6          this methamphetamine was coming from Mexico,

7          correct?

8     A.   That is correct.

9     Q.   Brandon Swarts was also indicted in this case

10         and pled guilty, correct?

11    A.   Yes, sir, he did.

12    Q.   Brandon Swarts was getting methamphetamine

13         from Gary Heath, correct?

14    A.   Yes, he was.

15    Q.   At least during the portion of the

16         investigation.  And he was asked specifically

17         about his understanding about the

18         methamphetamine source.  Do you recall that?

19    A.   Yes, he was.

20    Q.   And what did he indicate his understanding

21         was about the country of source of this

22         methamphetamine?

23    A.   Mr. Swarts was led to believe, or believed,

24         obviously, that the methamphetamine in which

25         he was obtaining from Gary Heath was

```
 1          methamphetamine that had been imported from

 2          the Country of Mexico by or through the

 3          sources that Mr. Heath was obtaining the

 4          methamphetamine from.

 5     Q.   Let me show you Government's Exhibit Number

 6          10.  Do you recognize that?

 7     A.   Yes, sir, I do.

 8     Q.   And is that the report of the postplea

 9          debriefing or proffer of Mr. Swarts?

10     A.   Yes, sir, it is.

11     Q.   And it contains that statement reference to

12          the source of methamphetamine, correct?

13     A.   Yes, it does.

14     Q.   Now, in conjunction with this end of the

15          investigation, DEA in Arizona likewise

16          conducted a joint investigation, correct?

17     A.   Yes, sir, they did.

18     Q.   And were you made privy to some of the fruits

19          of that investigation?

20     A.   Yes, sir.  We worked with the agents in

21          Phoenix, Arizona, yes.

22     Q.   And was there a determination through

23          surveillance and wiretaps there as to the

24          source of the methamphetamine that Molina and

25          Rubio-Ayala were actually physically picking
```

1       up in Phoenix?

2   A.  Yes, there was.

3   Q.  And can you describe that evidence for the

4       Court?

5   A.  Initially during the course of our

6       investigation we identified that Mr. Molina

7       would travel from Kansas to Arizona to obtain

8       methamphetamine.  Electronic surveillance, as

9       well as physical surveillance on numerous

10      occasions, placed Mr. Molina in the State of

11      Arizona, specifically the City of Phoenix,

12      during which times intercepted communications

13      clearly identified that Mr. Molina was

14      travelling to the State of Arizona to obtain

15      methamphetamine.  Typically he transported

16      narcotics proceeds to Phoenix, Arizona, to

17      meet with his sources of supply.  In exchange

18      he would receive numerous pounds of

19      methamphetamine and transport them back to

20      the State of Kansas.

21              We provided this information to

22      agents in the Phoenix, Arizona, office at

23      which time they conducted an investigation.

24      They began identifying the individuals --

25      which there were more than one -- operating

1            in Phoenix, Arizona, that were supplying

2            Mr. Molina with the methamphetamine.  Through

3            their investigation they initiated authorized

4            interceptions of communications, and through

5            those intercepted communications they clearly

6            identified that the methamphetamine coming to

7            Mr. Molina's sources was coming from the

8            Country of Mexico.

9                      They conducted surveillance efforts

10           of both narcotics coming into the United

11           States, or into Phoenix, and money leaving

12           Phoenix and headed to the Country of Mexico.

13           At times they chose to seize some of those

14           narcotics as well as those narcotics

15           proceeds.  Their investigation--

16                      THE COURT:  All right.  Can I stop

17           you for a minute?

18                      THE WITNESS:  Sure.

19                      THE COURT:  So you're testifying

20           that the DEA in Phoenix actually surveilled

21           money leaving the United States, crossing the

22           border into Mexico, and the methamphetamine

23           crossing the border coming into Phoenix?  I

24           mean they were able to surveil these

25           transactions?

1              THE WITNESS:  I personally wasn't

2       present for those actions.  But based on

3       their intercepted communications of

4       Mr. Molina's sources, his sources called the

5       Country of Mexico and had conversations which

6       clearly would lead you to believe that they

7       were arranging for shipments of narcotics.

8              THE COURT:  All right.  So this is

9       not based on-- I misunderstood.  I thought

10      you meant visual surveillance back and forth.

11      But based on wiretap phone conversations from

12      the DEA investigation in Phoenix they

13      intercepted phone calls from Mr. Molina's

14      source in Phoenix to individuals in Mexico

15      and vice versa concerning transactions of

16      money and methamphetamine back and forth

17      across the border?

18              THE WITNESS:  That is correct, Your

19      Honor.  Also, they did conduct surveillances

20      and they did observe narcotics proceeds

21      travelling south from Phoenix, Arizona, which

22      they believed to be headed to Mexico.  They

23      did interdict some of those as well as

24      narcotics coming the other way into the

25      United States, or from the south towards

1          Phoenix, they believe to come from Mexico.

2                    THE COURT:  So they did interdict

3          both money and methamphetamine before it

4          could cross the border based on the visual

5          surveillances?

6                    THE WITNESS:  They interdicted money

7          prior to crossing the United States into the

8          Mexico border.  There was no methamphetamine

9          I'm familiar with interdicted in Mexico in

10         this case.  I'm only familiar with

11         methamphetamine seized within the United

12         States.

13                   THE COURT:  Okay.

14    Q.   (By Mr. Hough)  And was some of the

15         methamphetamine seized in the United States

16         seized in Arizona after the vehicles had

17         passed through and across the border?

18    A.   I know that there was methamphetamine seized

19         there.  I'm not clear as to exactly where it

20         was or if they ever actually observed the

21         vehicles cross the physical border itself.

22         Surveillance is very hard to do when you're

23         talking about something coming from one

24         country to the other.  Identifying the

25         transport vehicle and so on and so forth

```
 1              leaving one country and coming into the

 2              United States is difficult to do.  I don't

 3              know for sure.

 4    Q.        Based upon your training and experience,

 5              understanding of the investigation here, and

 6              understanding of the investigation in

 7              Phoenix, was it concluded by agents that the

 8              methamphetamine was coming from Mexico?

 9    A.        Clearly it was, yes.

10    Q.        And there were actual recorded phone

11              conversations from the Molina/Rubio-Ayala

12              source in Phoenix to other parties in Mexico

13              specifically discussing importation of

14              methamphetamine?

15    A.        That is correct.

16    Q.        Okay.

17                   Now, Danielle Kostiuk was the

18              girlfriend of Gary Heath, correct?

19    A.        Yes, sir, she was.

20                   MR. HOUGH:  For the record, her name

21              is spelled K-O-S-T-I-U-K.

22    Q.        (By Mr. Hough)  She was indicted separately

23              and pled guilty, correct?

24    A.        Yes, sir, she did.

25    Q.        And she provided statements to agents as
```

1        well, correct?

2    A.    Yes, she did.

3    Q.    And she identified this defendant as the

4         person supplying Heath and the person in the

5         organization supplying him with 8 ounces of

6         methamphetamine two times a week; is that

7         correct?

8    A.    There again, I haven't read her statement

9         lately, but that sounds familiar, yes.

10   Q.    Let me show you Government's Exhibit 3.  Do

11        you recognize that as the report of the

12        postplea statement of Ms. Kostiuk?

13   A.    Yes, sir, I do.

14   Q.    And Ms. Kostiuk had a cooperation agreement

15        with the government as well, correct?

16   A.    Yes, sir, that is correct.

17   Q.    She and her attorney, Jerry Berger, looked

18        over that report and indicated its accuracy,

19        correct?

20   A.    Yes, sir, they did.

21   Q.    And in that report she attributes that much,

22        8 ounces twice a week of methamphetamine,

23        supplied to Gary Heath from this defendant,

24        correct?

25   A.    Yes, she does.

1    Q.   So independently of Gary Heath's information

2         he is corroborated by the statements of

3         Ms. Kostiuk and Mr. Swarts, correct?

4    A.   Yes, that is correct.  Among others.

5    Q.   Okay.

6              Now, Ramiro Soto also was indicted

7         in this matter as a coconspirator, correct?

8    A.   Yes, sir, he was.

9    Q.   And he pled guilty and likewise provided a

10        statement to the government, correct?

11   A.   Yes, sir, he did.

12   Q.   And he was prepared to testify had the trial

13        gone all the way to conclusion, the trial we

14        started November 4th in this courtroom,

15        correct?

16   A.   That is correct.

17   Q.   Let me show you Government's Exhibit Number

18        5.  Do you recognize that as a report of his

19        statement to law enforcement?

20   A.   Yes, sir, I do.

21   Q.   And relative to who was in charge in the

22        role, in his statement he references taking

23        directions from this defendant, correct?

24   A.   That is correct.

25   Q.   And can you describe for us, please, some of

1          the things he was directed to do by the

2          defendant and observed the defendant doing?

3    A.    Ramiro acted as a caregiver for a stash house

4          location during part of his role in the

5          conspiracy.  He resided at a residence where

6          weapons, drugs, cutting agents, and narcotics

7          proceeds were stored.  He did that at the

8          direction and request of Ayala and Molina.

9                    In this statement, he specifically

10         stated that on several occasions he was asked

11         by Ayala to purchase MSM.  MSM is a cutting

12         agent commonly used to dilute a purer form of

13         methamphetamine.  MSM's original purpose, or

14         manufactured purpose, is that of the

15         enhancement of joint flexibility in animals.

16         It is available at farm and home stores, and

17         its intended purpose is to add it as a

18         supplement for horses specifically to enhance

19         their joint flexibility.  However, it's color

20         and texture is very similar to that of

21         methamphetamine.  And many distributors

22         utilize MSM with water.  They cook it to a

23         liquid form.  They let it dry and then it

24         crystallizes and it looks nearly identical to

25         that of the ice form of methamphetamine.

1           They then take a purer form of

2     methamphetamine, being somewhat in the

3     90 percentile range of actual

4     methamphetamine.  They then add the MSM as a

5     cutting agent to dilute the methamphetamine

6     to essentially turn 1 pound into 2 or 1 pound

7     into a pound and a half or however they

8     choose.  And essentially they make more money

9     off of their quantity of methamphetamine by

10    decreasing its quality.  A pound of MSM can

11    be purchased for approximately 9 to 11

12    dollars.

13           Additionally, Mr. Soto in this

14    statement stated that he assisted Ayala in

15    counting money at this trailer that he

16    resided at, which was at 1745 Northwest Lyman

17    Road, I believe it was lot 46, in Topeka,

18    Shawnee County, Kansas.  Each time they

19    counted around 14, $15,000.  He said that the

20    money was derived from selling drugs.

21           He also described a second residence

22    near the 31st and Adams intersection, which

23    was identified by agents during the course of

24    this investigation as a stash house location

25    utilized by Mr. Ayala and Mr. Molina.  He

```
1          identified--

2                    THE COURT:  I'm sorry, as a stash

3          house used by Mr. Ayala and Mr. Molina?

4                    THE WITNESS:  Yes.  They did

5          everything pretty much together.

6    A.    Mr. Soto identified an individual, Filoberto

7          Ruiz, known as Beto, as an individual that

8          resided at that residence.  He specifically

9          stated that Mr. Ruiz was in charge of cooking

10         and cutting all of the methamphetamine at

11         that residence.

12                   That residence was identified, as I

13         said, as their stash house location.  I can

14         recall specific surveillances where

15         Mr. Molina had returned from Phoenix,

16         Arizona, with a vehicle and had pulled it

17         into a garage.  We clearly believe it

18         contained shipments of methamphetamine.

19                   Additionally, we observed Mr. Ayala

20         and other individuals in conjunction with the

21         intercepted communications leaving that

22         residence and distributing narcotics,

23         specifically that of methamphetamine.

24                   Mr. Soto went on to state that in

25         approximately January of '09 he transported
```

1      firearms to the Country of Mexico at the

2      direction of Rubio-Ayala.  He specifically

3      describes a 1998 Ford Ranger, red in color,

4      that he transported these firearms in, and

5      that he crossed the United States into Mexico

6      at the El Paso border crossing.

7              He said that the firearms were

8      hidden in the air-conditioning vents of the

9      vehicle.  And he said that he delivered the

10     firearms to Jesus Rubio-Ayala, who is Mr.

11     Alfonso Rubio-Ayala's brother.  He stated

12     that he was paid $1,000 for the transport of

13     these firearms into the Country of Mexico.

14             During the course of this

15     investigation, agents are familiar with this

16     truck.  We observed this vehicle.  We

17     specifically observed this vehicle parked at

18     the 1745 Lyman trailer, as previously

19     described, where at that time Mr. Soto did

20     reside.  I believe that vehicle actually to

21     be registered to Filoberto Ruiz, who is the

22     other individual who resided at the stash

23     house located on 31st Street.

24             Mr. Soto went on to state that he

25     had also seen firearms at the stash house

1      location on 31st Street.  He described one as

2      an older assault rifle, describing it as a

3      7.62 caliber rifle.  And he stated that

4      Mr. Molina had purchased that rifle.

5           He did state also, as did Mr. Heath,

6      that he wasn't sure who was in charge of this

7      drug trafficking organization, whether it was

8      Mr. Ayala or Mr. Molina, but that they each

9      had higher level roles and that they worked

10     together in this.

11          He went on to discuss a residence in

12     Kansas City that was another stash house

13     location.  This residence was identified by

14     agents as being 3128 Eaton in Kansas City,

15     Kansas.  This residence took over for the

16     31st Street residence in Topeka, Kansas.

17     They moved a stash house location.  They

18     moved from the 31st and Adams area in Topeka,

19     Kansas, as described by Mr. Soto, to this

20     3128 Eaton address in Kansas City, Kansas.

21     Again, this residence was identified by

22     agents through surveillance and intercepted

23     communications and identified as a stash

24     house location under the control of both

25     Mr. Ayala and Mr. Molina.  Ultimately, agents

35

1         did seize in June of 2009 a vehicle from that

2         residence that contained approximately 6 or 7

3         pounds of methamphetamine.

4                  Mr. Soto went on to describe

5         distribution of methamphetamine that he did

6         at the direction of Mr. Ayala.  He identified

7         distributing methamphetamine to Gary Heath.

8                  THE COURT:  This is Mr. Soto you're

9         talking about?

10                 THE WITNESS:  Mr. Soto is describing

11        his actions, yes.

12   A.   He describes specifically how the

13        methamphetamine was packaged, the locations

14        in which he delivered it to.  He estimated 9

15        to 10 ounces of methamphetamine is what he

16        delivered to Mr. Heath.

17                 Mr. Soto went on to describe that

18        Mr. Molina and Mr. Ayala had a blue and a

19        maroon Ford Tarus and that both vehicles had

20        hidden compartments behind the stereos and

21        that they also had several pickup trucks.  It

22        should be noted that during the course of our

23        investigation both a blue Ford Tarus and a

24        maroon Mercury Sable were seized and both did

25        in fact contain hidden compartments behind

```
 1        the stereos.
 2                    Additionally, Mr. Soto stated that
 3        Mr. Molina made trips to Phoenix, Arizona.
 4        He would transport methamphetamine from
 5        Phoenix to Topeka, Kansas.
 6                    Furthermore, Mr. Soto made at least
 7        one trip to Phoenix, Arizona, with
 8        Mr. Molina.  During that trip, prior to
 9        leaving Mr. Ayala had given Mr. Soto a cell
10        phone to use as a form of communication while
11        traveling with Mr. Molina to Phoenix,
12        Arizona, and back.
13   Q.   (By Mr. Hough)  That cell phone, during the
14        course of the investigation, were you able to
15        determine who it was registered to, who the
16        billing came to?
17   A.   I know that that phone had been identified as
18        a phone utilized by Mr. Ayala.  The
19        subscriber information on the phone I'm not
20        clearly certain of whose it was, but I
21        believe that it was subscribed to by Kelly
22        Rubio, if I remember correctly, the wife or
23        significant other of Mr. Ayala.
24   Q.   Now you mentioned the packaging and how --
25        that's Mr. Armando Soto, correct --
```

37

1    A.    Yes, he did.

2    Q.    --how he described the packaging.  Now, the

3          methamphetamine, approximately 10 pounds that

4          was seized at the conclusion of the

5          investigation from the various residences and

6          from the various vehicles, do you recall that

7          being introduced into evidence during that

8          period of the trial that occurred here and

9          the trial testimony of how it was packaged

10         and wrapped?

11   A.    I do recall some of it.

12   Q.    And was that consistent with the description

13         Armando Soto-Soto gave of the methamphetamine

14         that he moved for Mr. Rubio-Ayala, that

15         unique packaging method?

16   A.    I believe it was.  Mr. Soto describes the

17         methamphetamine as being wrapped in aluminum

18         foil.  And I do recall seizing

19         methamphetamine that was packaged in aluminum

20         foil.  I also recall seizing aluminum foil

21         and various other packaging materials from

22         several different residences during the

23         course of this investigation.

24               Also some ammunition seized from the

25         Lyman trailer that I previously discussed was

```
 1              packaged in aluminium foil.  We believe that
 2              was to assist in concealing it as it was
 3              transported to the Country of Mexico.
 4                        I was trying to recall the
 5              methamphetamine I personally purchased as an
 6              undercover agent from Mr. Ayala and to what
 7              his packaging was, but I don't recall.
 8      Q.     Okay.  Now, on that topic and your controlled
 9              purchases of methamphetamine from
10              Mr. Rubio-Ayala, how many times did that
11              occur?
12      A.     I only purchased methamphetamine from
13              Mr. Ayala directly on two occasions, both
14              being in December of 2008.
15      Q.     And you were introduced to him by someone of
16              his underlings that you had purchased
17              methamphetamine from, correct?
18      A.     Yes, sir, that is correct.
19      Q.     And who was that under?
20      A.     He was Francisco Nunez.
21      Q.     Okay.  So based on the investigation,
22              Francisco Nunez, Armando Soto-Soto, Renato
23              Garcia-Medina--
24                        THE COURT:  Can you slow down?
25                        MR. HOUGH:  I'm sorry, Judge.
```

```
1                    THE COURT:  Armando Soto, Francisco

2          Nunez--

3                    MR. HOUGH:  Renato Garcia-Medina.

4    Q.   (By Mr. Hough)  --Filoberto Ruiz, also known

5          as Beto, and Ramiro Soto were all

6          coconspirators in America in Northeast Kansas

7          that would have been directed by this

8          defendant, Rubio-Ayala, jointly with Molina,

9          correct?

10   A.   Yes, sir, that is correct.

11   Q.   Okay.

12                   You mentioned residences in Kansas

13         City, Kansas, that were used as stash houses

14         and for other purposes.  Do you recall that

15         testimony a moment ago?

16   A.   Yes, sir.

17   Q.   During the course of the investigation, did

18         agents identify a residence on 57th Street?

19   A.   Yes, sir, we did.

20   Q.   Was that in Kansas City, Kansas?

21   A.   Yes, it was.

22   Q.   And can you describe for the Court, please,

23         what was going on there based upon the

24         surveillance, the wiretap reported calls, and

25         the statements of the coconspirators who
```

```
 1            entered guilty pleas in this case?
 2    A.      That residence was identified sometime during
 3            the winter-- in the spring of 2009.  It was
 4            identified as a residence where Mr. Renato
 5            Garcia-Medina was residing.  The residence
 6            was used, as were others, to store
 7            methamphetamine, firearms, narcotics,
 8            proceeds, vehicles, whatever was needed by
 9            the trafficking organization.
10            Mr. Garcia-Medina resided there and during
11            that time frame was acting upon the direction
12            of Mr. Molina in the furtherance of this
13            trafficking group.
14    Q.      Now, Renato Garcia-Medina was indicted as a
15            conspirator in this case, correct?
16    A.      Yes, sir, he was.
17    Q.      Entered a guilty plea and agreed to cooperate
18            with the government, correct?
19    A.      Yes, sir, that is correct.
20    Q.      Gave a postplea debriefing and was prepared
21            in fact to testify had this trial gone to
22            conclusion, the trial that started in this
23            courtroom November 1, correct?
24    A.      Yes, sir, it did.
25    Q.      And he was represented by Diane Barger, a
```

| | | |
|---|---|---|
| 1 | | private attorney from Wichita, correct? |
| 2 | A. | Yes, sir, that's correct. |
| 3 | Q. | Let me show you Government's Exhibit Number |
| 4 | | 6.  Do you recognize that? |
| 5 | A. | Yes, sir.  This is an interview conducted of |
| 6 | | Renato Garcia-Medina. |
| 7 | Q. | That's the report of the proffer or postplea |
| 8 | | debriefing interview of Renato, correct? |
| 9 | A. | Yes, it is. |
| 10 | Q. | And prior to the trial he and his attorney |
| 11 | | sat down and went over that and indicated to |
| 12 | | us that that truly and accurately referenced |
| 13 | | his statement, correct? |
| 14 | A. | Yes, that is correct. |
| 15 | Q. | And in that statement he specifically |
| 16 | | references his role in the offense and that |
| 17 | | he was essentially taking orders from this |
| 18 | | defendant and Mr. Molina, correct? |
| 19 | A. | That is correct.  Specifically, he actually |
| 20 | | came from the Country of Mexico to the United |
| 21 | | States to work for Mr. Molina and Mr. Ayala |
| 22 | | to distribute narcotics. |
| 23 | Q. | Okay.  He was recruited? |
| 24 | A. | Yes.  He had been here once prior and then |
| 25 | | came again during the course of this |

```
 1              investigation.

 2   Q.    Now, Armando Soto-Soto also was an indicted

 3         coconspirator in this case, correct?

 4   A.    Yes, sir, he was.

 5   Q.    And he pled guilty, agreed to cooperate, and

 6         provided a statement after his plea, correct?

 7   A.    Yes, sir, he did.

 8   Q.    He was represented by Mike Highland, a

 9         private attorney in this area, correct?

10   A.    I don't specifically recall his counsel, but

11         he was represented by counsel, yes.

12   Q.    Okay.  And he too was prepared to testify had

13         this trial gone to conclusion, correct?

14   A.    Yes, he was.

15   Q.    And in that process pretrial went over the

16         reports of his statements to law enforcement,

17         indicating that they were true and accurate

18         reports, correct?

19   A.    Yes, sir, we did.

20   Q.    Let me show you Exhibits 7, 8, and 9.  Take a

21         moment and look at those, if you would,

22         please.  Do you recognize those?

23   A.    Yes, sir, I do.

24   Q.    And are those the reports of interviews of

25         Armando Soto-Soto?
```

```
 1   A.   Yes, sir, they are.

 2   Q.   And in those he specifically indicates the

 3        role of Mr. Rubio-Ayala as a coleader, if you

 4        will, with Mr. Molina, correct?

 5   A.   Yes, sir, he does.  He worked for Mr. Ayala

 6        and Mr. Molina in the trafficking

 7        organization.

 8   Q.   And during the course of those interviews can

 9        you describe for us how he describes his role

10        and his observations of Mr. Rubio-Ayala

11        directing underlings in this matter.

12   A.   Well, without going through and actually

13        reading these, I'll review them real quickly.

14        He said that he began working for Mr. Molina

15        and Ayala in March of '09 by assisting Renato

16        Garcia mix methamphetamine and cutting agents

17        together at the 3128 Eaton residence in

18        Kansas City, Kansas.  He identified

19        purchasing MSM for the organization.  He

20        stated that he believed Molina and/or, not

21        either, but Molina and/or Rubio-Ayala were in

22        charge of the trafficking organization.

23             He went on to discuss conversations

24        he'd overheard between Mr. Ayala and

25        Mr. Molina about different individuals about
```

1          observing them boil the MSM into a watery

2          consistency as he poured it onto aluminium

3          foil to dry, making the MSM look like

4          crystals or glass, and that they would mix

5          the MSM with methamphetamine.

6               He said that Mr. Ayala and

7          Mr. Molina would package money and take it

8          into the basement.  He discussed dollar

9          amounts of 10 to 15,000 on each occasion.  He

10         discussed firearms that were stored in the

11         stash house locations.

12              Additionally, he discussed the

13         actions in which he took to assist them,

14         removing firearms and transporting controlled

15         substances and purchasing MSM.

16    Q.   Now, the dope-- the methamphetamine that was

17         seized in this matter was submitted to a

18         laboratory for testing, correct?

19    A.   Yes, sir, it was.

20    Q.   And it in fact was tested by a forensic

21         chemist consistent with what is accepted in

22         their scientific community as appropriate,

23         correct?

24    A.   Yes, sir, it was.

25    Q.   They actually found MSM in some of this dope

```
1              that was seized, correct?

2     A.       Yes, in all the methamphetamine prepared for

3              distribution MSM would have been detected, or

4              was detected.

5     Q.       Okay.

6                   Do you have additional information

7              specifically that you would like to provide

8              to the Court relative to these issues?

9     A.       Just a couple, if I may.  Again, referring to

10             phone conversations on December 17th, 2008,

11             target telephone 6, as previously described

12             and utilized by Rubio-Ayala, call number 526,

13             is a conversation between Mr. Rubio-Ayala and

14             a person referred to as Beto, identified as

15             Filoberto Ruiz.

16                  During the conversation Rubio-Ayala

17             told Beto, quote, take the job out in 20

18             minutes so it can be prepared.  Beto replied,

19             "Okay."  Rubio-Ayala replied, "Or if you have

20             a chance, start making the corte," or the

21             cut, "two at a time."  Beto replied, "What do

22             you mean two at a time?"  Rubio-Ayala

23             replied, quote, put two in each bag.  Beto

24             asked, "How much is it?"  Rubio-Ayala

25             replied, quote, make it 57.
```

1            57-- well, actually 56 grams is

2        2 ounces of methamphetamine.  There's 28

3        grams per ounce.

4                THE COURT:  56 grams is 2 ounces?

5                THE WITNESS:  That's what can

6        commonly be distributed.  They make it 57.

7        They add a gram for the packaging material,

8        the plastic baggie, for what it weighs.

9    A.   Essentially what Mr. Ayala is telling Beto,

10       or Filoberto Ruiz here, is when he says "take

11       the job out," the "job" is referring to the

12       methamphetamine.  So it can be prepared.  By

13       preparing it is adding MSM to the

14       methamphetamine to dilute it and prepare it

15       for distribution.

16                Additionally, when they refer to the

17       corte, or the cut, they're referring to the

18       MSM.  And then when he says "make it 57,"

19       he's referring to the weight.

20                So essentially this conversation is

21       important because Mr. Ayala is telling

22       Filoberto Ruiz to prepare methamphetamine for

23       distribution and explaining to him how to do

24       that.

25                THE COURT:  Tell me again.  Where

1    did Mr.-- where did Beto live?

2          THE WITNESS:  He resided initially

3    at 31st and Adams and/or at the 1745 Lyman

4    trailer house during the earlier part of the

5    investigation in 2008.  He's currently a

6    fugitive, as he went back to Mexico during

7    the part of this investigation and has not

8    been located.

9  A.   An additional conversation, real quickly, on

10    December 16th of 2008, again target telephone

11    6 identified as being used by Rubio-Ayala

12    with Ramiro being Ramiro Soto.  During the

13    conversation, Rubio-Ayala told Ramiro, quote,

14    buy me a bunch of corte.  Which is cut or

15    MSM.  Ramiro replied, "How many?"

16    Rubio-Ayala replied, "About three or four.

17    And take it to your house and then I'll go

18    over there."  Ramiro replied, "All right."

19          Simply, Mr. Ayala is directing

20    Ramiro, as he stated in his proffer, to go

21    and buy MSM and then take it to his house.

22    At that time we believe that residence was at

23    1745 Northwest Lyman in Topeka.  And, again,

24    that MSM was used to prepare methamphetamine

25    for distribution.

```
 1                        Those are just two examples with two

 2            different individuals that Mr. Ayala directed

 3            in the furtherance of this trafficking

 4            organization.

 5       Q.   (By Mr. Hough)  And regarding Mr. Ramiro

 6            Soto, in your conversations with him prior to

 7            the commencement of the trial, he and Renato

 8            and Armando were prepared to testify that

 9            during their conversations, which were

10            recorded, that the references to corte was

11            references to cutting material for

12            methamphetamine, correct?

13       A.   Yes, sir, that is correct.

14       Q.   And that the cutting material that this

15            organization used was in fact MSM, correct?

16       A.   Yes, sir, that's correct.

17       Q.   Let me see these.

18                        MR. HOUGH:  Judge, before I carry on

19            and forget, let me offer Exhibits 9, 8, 7, 6,

20            5, 3, 10, 1, and 2.

21                        MR. KESSLER:  No objection, Your

22            Honor.

23                        THE COURT:  Not 4?

24                        MR. HOUGH:  Not 4, Judge.

25                        THE COURT:  All right.  Exhibits 1
```

1              through 3 and 5 through 10 are admitted.

2    Q.    (By Mr. Hough)  Now there were reported

3          conversations while coconspirators were in

4          Mexico that this defendant was a party to,

5          correct?

6    A.    Yes, sir.

7    Q.    Are there any of those that you can describe

8          for us?

9    A.    There's a conversation on December 29th of

10         2008.  The conversation, again, is on target

11         telephone 6 and it's between Mr. Ayala and

12         Beto, or Filoberto Ruiz.  This conversation

13         is prompted from a telephone conversation, if

14         I recall correctly, between Adan Molina and

15         Renato Garcia-Medina.  During that

16         conversation between Mr. Molina and

17         Mr. Renato Garcia-Medina, Mr. Medina was in

18         the Country of Mexico and they were

19         discussing Mr. Medina coming back into the

20         United States.  They were discussing

21         narcotics in the Country of Mexico and what

22         Mr. Medina could obtain.  Then there was a

23         conversation between Mr. Molina and Mr. Ayala

24         requesting that Mr. Ayala send money to

25         Mr. Medina in the Country of Mexico.

```
 1                     On December 29th of 2008, call

 2          number 1552, Mr. Ayala has a telephone

 3          conversation with Beto, or Filoberto Ruiz.

 4                     THE COURT:  What date is that again?

 5                     THE WITNESS:  November 29th, 2008.

 6                     THE COURT:   And tell me again.

 7          It's call 1552.  And who are the

 8          participants?

 9                     THE WITNESS:  Yes, it's call 1552,

10          and it's Mr. Ayala talking to Filoberto Ruiz,

11          a/k/a Beto.

12     Q.   (By Mr. Hough)  Was that November or

13          December 29th?

14     A.   It's December 29th.

15     Q.   Okay, thank you.

16     A.   During the conversation, Mr. Ayala asks,

17          quote, listen, can you go to Rodeo to send

18          some money to Mexico?  Beto replied, "At

19          Rodeo?"  And Ayala replied, "Yes," to Renato

20          Garcia-Medina.  Beto replied, "How much?"

21          Ayala replied, "1,000.  Do you have 1,000

22          bucks there?"  Beto replied, "I just have

23          500, Dude."  Ayala replied, "Come over to the

24          house and I'll give you a thousand."

25                     Molina had discussed with Garcia to
```

1      send him money -- I believe this was in

2      preparation of Medina coming to the United

3      States the second time -- and transferred

4      that duty to Mr. Ayala, who in turn

5      transferred that duty to Filoberto Ruiz and

6      provided the thousand dollars to Mr. Ruiz to

7      be sent specifically to Renato Garcia-Medina

8      in Mexico.

9              THE COURT:  And the conversations

10     indicated this was from Mr. Garcia-Medina to

11     bring drugs with him?

12             THE WITNESS:  No.  The conversation

13     between Mr. Garcia-Medina and Mr. Molina

14     discussed the availability of controlled

15     substances that Mr. Medina had access to in

16     the Country of Mexico.  They discussed

17     Mr. Medina coming to the United States, which

18     he ultimately did, to work for the second

19     time for Mr. Molina.

20             This money, I don't believe, was for

21     the purchase of any controlled substances

22     with it only being a thousand dollars.

23     Typically money sent to the Country of Mexico

24     in payment for controlled substances would be

25     much larger.  I'm not saying people don't

1          wire money to Mexico to pay for drugs.  But

2          in this particular case we did not see that.

3          I believe this money was money for Mr. Medina

4          to be able to contact the individuals whom

5          had narcotics or who he thought had narcotics

6          in Mexico and additionally spending money for

7          him so that he could come to the United

8          States.

9                    THE INTERPRETER:  If it please the

10         Court--

11                   THE COURT:  Yes.

12                   THE INTERPRETER:  --Your Honor,

13         would it be possible to take a five-minute

14         break?

15                   THE COURT:  Oh, absolutely.

16                   THE INTERPRETER:  I've been

17         interpreting for about an hour.

18                   THE COURT:  Absolutely.  Let's take

19         about 10 minutes.

20                        (THEREUPON, a recess was

21         taken).

22                   THE COURT:  Okay.  Proceed.

23                   MR. HOUGH:  Judge, at this time I'd

24         ask the Court to take judicial notice of the

25         trial evidence that was presented in this

1      matter beginning November 1st and concluding

2      immediately before the guilty plea that

3      occurred here November 4th.

4                THE COURT:  All right.  The Court

5      will take judicial notice of the evidence at

6      trial.  Just to synopsize, as I recall, the

7      evidence that you presented before the final

8      plea of Mr. Molina, I guess it was, was a

9      search warrant at 3128 Eaton, a search

10     warrant at Mr. Rubio-Ayala's house, a search

11     warrant at a house in Great Bend.  Is that

12     it?

13               MR. HOUGH:  There were multiple in

14     Great Bend and in Topeka and Kansas City.

15     Grand total, approximately 10 pounds of

16     methamphetamine, $692,000 in U.S. Currency,

17     and a plethora of firearms.  One from this

18     defendant's house that was a 1911 frame

19     chrome-like firearm with a fancy etched grip

20     that matched almost exactly a similar gun

21     taken from Adan Molina's house.  Thank you.

22               And that's all the questions I have

23     of the witness.

24               Counsel.

25               MR. KESSLER:  Judge, just to address

1      what he mentioned in here about the evidence

2      that was presented prior to the pleas, I have

3      a question for the officer concerning that.

4                      CROSS-EXAMINATION

5      BY MR. KESSLER:

6  Q.  Mr. Hough stated there was a gun found when

7      the search was conducted at Mr. Rubio-Ayala's

8      house.  Do you recall that?

9  A.  Yes, sir, I do.  Mr. Ayala pointed the

10     firearm out to me that day.

11 Q.  All right.

12              Were there any drugs found in that

13     house the day of the search?

14 A.  No, sir, there were not.

15 Q.  Was there any cash that could be readily

16     identified as proceeds of any drug deal found

17     in the house at that time?

18 A.  I don't recall any significant amounts of

19     currency.  However, I wasn't present at the

20     house the whole time, just for a brief

21     moment.

22 Q.  While we're on the subject of the guns, you

23     personally bought drugs undercover from

24     Alfonso Rubio-Ayala on two occasions; is that

25     correct?

55

1     A.    Yes, sir, that is correct.

2     Q.    On either of those occasions could you tell

3           whether he was personally armed with a

4           firearm?

5     A.    I did not notice that Mr. Ayala was carrying

6           a firearm during either transaction.

7     Q.    As to the drugs coming from Mexico, most of

8           the defendants and confidential sources and

9           other people that you interviewed, or were

10          interviewed by agents in this case, were

11          aware that most of the defendants in this

12          case originally came from Mexico; were they

13          not?

14    A.    I believe so.  Yes, I believe some of them

15          are aware that many defendants and

16          codefendants were from the Country of Mexico.

17    Q.    And they were aware that some of them

18          travelled to and from Arizona on occasion?

19    A.    Some of them were, yes.

20    Q.    So they assumed the drugs were coming across

21          the border in Arizona?

22    A.    I don't know that they assumed anything.  I

23          know that they conveyed to investigators what

24          they had either been told, or in Ramiro

25          Soto's case what he had been a participant

1          to.

2     Q.   All right.  But the DEA did not actually see

3          any drugs coming across the border in

4          Arizona; is that correct?

5     A.   The DEA intercepted communications and

6          identified parties in the Country of Mexico

7          who were identified as the ultimate source of

8          supply.  However, I was not part of the

9          investigation in Phoenix so I don't know if

10         they physically observed drugs cross the

11         border or not.

12    Q.   I thought I understood your testimony on

13         direct to be that they seized either drugs or

14         money that was leaving Phoenix and going

15         south, but that they had not seized anything

16         at the border itself.  Is that correct?

17    A.   Well, I don't believe they seized any drugs

18         leaving Phoenix going south.  I believe that

19         they seized drugs either in Phoenix or

20         travelling from the border area to Phoenix

21         based on their surveillance and intercepted

22         communications.  And there again, I'm not-- I

23         wasn't active in the Phoenix investigation.

24         I was only in Arizona for a short period of

25         time during this investigation, so I can't

```
 1            answer those questions.
 2   Q.   All right.  The state of Arizona shares a
 3        border with Mexico; is that correct?
 4   A.   Yes, sir, it does.
 5   Q.   How long did this investigation go on,
 6        Officer Garman?
 7   A.   For approximately one year.  It initiated
 8        during June of 2008.  It became what I would
 9        call extremely active during August of 2008
10        when wire intercepts began.  And then the
11        investigation was concluded, or most of the
12        investigation was concluded, on or about
13        June 17th of 2009.
14   Q.   Do you know how many man hours were spent in
15        this investigation?
16   A.   No, I do not.
17   Q.   Significant number, would you say, by agents
18        and officers of various law enforcement
19        agencies?
20   A.   Yes, sir, there were.
21   Q.   You offered some testimony, as an expert I
22        guess, in drug dealing or drug organizations;
23        is that correct?
24   A.   Yes, sir, I've had the opportunity to testify
25        as an expert in federal court related to
```

```
 1            narcotics trafficking, drug investigations,
 2            and the interception of communications.
 3       Q.   And in that capacity you're somewhat familiar
 4            with the drug trade and the cartels that
 5            apply in Mexico; is that correct?
 6       A.   To an extent, yes, sir.
 7       Q.   Do you know how many people have been killed
 8            in Mexico in the last five years as a direct
 9            result of a drug cartel?
10                    MR. HOUGH:  Objection.  Irrelevant.
11                    THE COURT:  Overruled.
12                    If you know.
13       A.   Specifically, no.  I know that there have
14            been numerous murders or drug related
15            homicides in the Country of Mexico and the
16            border area.
17       Q.   (By Mr. Kessler)  Have there been reports
18            that that number exceeds 30,000?
19       A.   I would not be surprised.  I don't know the
20            exact number.
21       Q.   In your investigation of this case and other
22            cases, have you learned the reason why many
23            people move from Mexico to the United States?
24            Is it to get away from some of the violence
25            and conditions in Mexico?
```

A.   I believe that's a pretty general question.
     Some people have moved to the United States
     to gain legitimate employment and provide a
     better lifestyle for their family, some have
     moved to the United States to distribute
     controlled substances and to make a lot of
     money and then later move back to Mexico and
     build a home or provide for their families
     there, others have moved to the United States
     to avoid the violence.  There's various
     reasons.

Q.   You testified also in your past as an expert
     that sometimes guns are used to barter for
     drugs; is that correct?

A.   They can be, yes.

Q.   Was there any evidence that that happened in
     this case that you're aware of?

A.   Specifically, I don't believe that there
     were.  Initially we believed that Mr. Heath
     was providing firearms to Mr. Ayala and
     Mr. Molina in exchange for payments of his
     drug debts.  But through his proffer and
     discussions with him, he said that that was
     not the case, that the drug trafficking debt
     was not fulfilled by the firearms he provided

1          to them.

2                    MR. KESSLER:  That's all I have for

3          the officer, Your Honor.

4                    MR. HOUGH:  Judge, I have no further

5          questions for the witness.

6                    I do need to correct my response to

7          the defendant's objections.  In preparing my

8          response, I went to my stored copy in my

9          computer of the plea agreement, and

10         Mr. Kessler has pointed out to me that

11         paragraph 3 that I reference in my response

12         was deleted or redacted at the time of the

13         plea.  So my reference to the defendant

14         agreeing to a guideline sentence is

15         incorrect.  So in my response where I say the

16         defendant agreed to a guideline sentence,

17         that's incorrect and I need the record to be

18         changed and that portion of my formal

19         response redacted.

20                   THE COURT:  Well, I'll just consider

21         this as a oral modification of your response

22         to reflect that the defendant did not agree

23         to a guideline sentence.

24                   MR. HOUGH:  Thank you, Judge.

25                   And in referring to document 298,

1          page 10 of 21, the plea agreement in this

2          matter, at the top there, the second full

3          paragraph in paragraph 3, the facts pursuant

4          to the guilty plea that the defendant

5          stipulated to at the time of his plea were

6          that between June 15th, '08, and June 17,

7          '09, he participated in an organization that

8          distributed methamphetamine from Mexico to

9          Arizona to Great Bend.  So with that, we have

10          no further evidence to present to the Court.

11                  We'd ask the witness be excused

12          unless the Court has questions.

13                      THE COURT:  No, I don't.

14                      You can step down, Mr. Garman.

15                      THE WITNESS:  Thank you, Your Honor.

16                      THE COURT:  All right.  Any other

17          witnesses or evidence, Mr. Hough?

18                      MR. HOUGH:  No, Judge.  Thank you.

19                      THE COURT:  All right.

20                      Mr. Kessler?

21                      MR. KESSLER:  No, Your Honor.  Just

22          argument.

23                      THE COURT:  All right.  I'll hear

24          from you, Mr. Kessler, then on the objections

25          and argument you would like to make.

1              MR. KESSLER:  Thank you, Your Honor.

2     The objections that we've been discussing

3     here this morning I think were raised in

4     written objections and request for variance

5     that I filed.  I'll allow the Court to

6     consider those.

7              I think the Court needs to consider,

8     however, regardless of the guideline range

9     that the Court finds, the Court needs to

10    consider whether the sentence called for by

11    the guidelines is appropriate in this case.

12    This defendant has no prior criminal history.

13    That's accurately reflected in the

14    presentence report.

15              The proposed penalty in this case is

16    driven almost entirely by the amount of

17    drugs.  And that amount, in turn, is larger

18    than it often is in these types of cases

19    because of the extensive investigation

20    conducted by the government and various law

21    enforcement agencies in this case.  It

22    included not only an investigation here in

23    Topeka, but Kansas City, Great Bend, Arizona.

24    All the amounts of drugs by the various

25    codefendants in this case and other cases

1    which were brought arising out of those

2    investigations are used under the guidelines

3    to determine, at least in part, what the

4    proposed sentence is.

5            This defendant made two undercover

6    sales to Officer Garman.  He doesn't deny

7    that.  He has accepted responsibility for

8    that.  He also has accepted responsibility

9    for participating in the conspiracy itself.

10   And I understand that he can and probably

11   should be held responsible for more than just

12   the amounts involved in the two direct sales.

13   But in many cases there is not an

14   investigation that is as extensive as it is

15   here, and it drives the-- not only the amount

16   of drugs but the penalty that's suggested by

17   the guidelines.  So I think the Court needs

18   to consider that.

19           I guess I should digress and address

20   one other thing, that is, acceptance of

21   responsibility.  The defendant entered a plea

22   in this case.  And he didn't enter a plea

23   until after we had commenced trial; he did,

24   however, accept at that time responsibility

25   for his actions, and he continues to do so.

1      By entering a plea at that time, he saved the

2      government considerable time and effort

3      because the government had predicted that its

4      evidence would take seven weeks to present in

5      this case.

6           Under the application notes in the

7      guidelines, I know that the timeliness of the

8      plea is something that should be considered.

9      We're not asking that the government

10     recommend an additional point for acceptance

11     of responsibility, but I do think the Court

12     should consider granting him the two points

13     under the guidelines for accepting

14     responsibility.  It would have been better

15     had he done this earlier, but there were

16     other codefendants that began trial with him.

17     The government would have had to prepare for

18     trial and present evidence in those cases

19     anyway.  He did save the government a

20     significant amount of time by pleading when

21     he did.

22           Another thing that I want to address

23     briefly is disparity in sentencing.  There

24     was a companion case to this involving a

25     Pascual Vazquez-Villa which the government

1    tried.  The jury convicted Mr. Vazquez-Villa,

2    and he was ultimately sentenced to a term of

3    25 years by Judge Crow.

4              My understanding from the evidence

5    that I was provided in this case, and

6    statements made by the government, is that

7    Mr. Vazquez-Villa participated in the same

8    general conspiracy that this defendant is

9    accused of participating in.

10             And at the time of his sentencing,

11   and I have that case number somewhere, but at

12   the time of his sentencing the government

13   argued that he, along with Alfonso

14   Rubio-Ayala and Adan Molina, were the leaders

15   of this organization, or at least were middle

16   managers of the organization.

17             Our request is that the Court treat

18   Mr. Rubio-Ayala the same way that

19   Mr. Vazquez-Villa was treated as far as

20   sentencing.  And I think it would be

21   appropriate to consider giving this defendant

22   a shorter sentence than Mr. Vazquez-Villa

23   received and that's because he did in fact

24   acknowledge his responsibility for his

25   actions in this case.  He entered a plea of

1    guilty, although it was somewhat late in the

2    proceedings.  Mr. Vazquez-Villa's case number

3    is 09-CR-40061 in the District of Kansas.

4              Judge, I think those are the only

5    comments I have regarding sentencing.  We

6    would request that the Court adjust the

7    proposed guideline sentence to give him

8    credit for acceptance of responsibility, but

9    we would also ask that the Court vary from

10   the ultimate guideline sentence that's

11   determined to be appropriate and impose a

12   sentence below that.

13             I'll check one more time, but

14   Mr. Rubio-Ayala has indicated to me that he

15   does not wish to personally address the

16   Court.

17             THE COURT:  Okay.

18             MR. HOUGH:  May it please the Court,

19   Judge, I would start with reference to the

20   Vazquez-Villa matter.  I tried that matter

21   with Mr. Cornwell in Judge Crow's court.  At

22   the time of sentencing in fact the government

23   did argue Mr. Vazquez-Villa was at the same

24   level as Mr. Rubio-Ayala and Mr. Molina.

25   Judge Crow finding ultimately that that,

1          based upon the trial evidence, was not

2          correct.  That Mr. Vazquez-Villa was

3          essentially subservient to the

4          Molina/Rubio-Ayala organization, and not

5          holding Vazquez-Villa accountable for the

6          relevant conduct dope of the

7          Rubio-Ayala/Molina organization.  So while

8          that's not binding on this Court, to the

9          extent that Mr. Kessler's comments vary from

10         that, we would refer to the record.

11              THE COURT:  Well, tell me how-- why

12         did the government take the position that

13         Mr. Vazquez-Villa was at the same level as

14         these two defendants?

15              MR. HOUGH:  Because originally,

16         while he was part of the Molina organization,

17         ultimately Molina gets interdicted with a

18         quantity of drug proceeds.  When that

19         happens, about a year and a half to two years

20         prior to this investigation, and in fact if

21         the Court recalls the trial evidence that was

22         admitted, there was a receipt in the name of

23         Adan Molina for a quantity of currency seized

24         from him, that is the incident that

25         ultimately caused Vazquez-Villa to get hinky

1       over dealing with Molina.  And because of his

2       relationship with Molina and Rubio-Ayala, he

3       knew the source in Arizona.  So then he at

4       that point started going on his own to

5       Arizona to get his own dope.  So from that

6       point forward it was our position you

7       essentially had three, but Judge Crow said

8       no.

9              He based it upon his view of what I

10      just informed the Court and phone calls where

11      Vazquez-Villa is having a conversation with

12      Adan Molina over a client who was unhappy

13      with methamphetamine Vazquez-Villa had

14      provided to him.  And Vazquez-Villa goes to

15      Molina and says, "Can I swap out some dope

16      with you?"  He acknowledges it's the same

17      dope from the same source, but if I give it

18      from you to him, maybe that will clear up the

19      situation.  That customer not wanting to pay

20      Vazquez-Villa for the dope he had fronted

21      him.

22             So based on that, Judge Crow said,

23      "No, Vazquez-Villa is subservient.  I'm

24      basing his sentence solely upon what

25      came-- what you can give me hand-to-hand and

1      out of the house of Vazquez-Villa.  I'm not

2      attributing Molina's organizational dope to

3      Vazquez-Villa."

4              One thing that goes hand in glove

5      with that is that counsel argues the penalty

6      is driven by drugs over the course of a year

7      investigation.  That simply is not true.  If

8      the Court looks at the presentence

9      investigation report, paragraph 38 and

10     paragraph 117, the drugs located at the Eaton

11     residence alone, which are clearly attributed

12     to this defendant on one day, are in excess

13     of 1.5 kilos of methamphetamine actual and

14     drugs used in the drug calculation.

15             So consequently, the whole penalty

16     driven by drugs over the course of a year,

17     that argument has been successful in cases

18     where enforcement agencies have purchased

19     over and over and over and over again

20     quantities of controlled substances from

21     individuals and organizations, and that

22     drives up the quantity and then the Court is

23     faced with, well, they bought dope from this

24     guy for a year so consequently you've got 10

25     pounds as opposed to the quarter ounces he

1          was dealing in each time.

2                    That's not the case here.  This is

3          an organization that this defendant led and

4          organized that was dealing at 10 pounds or

5          more every time.  During the course of this

6          investigation in agents monitoring the wire,

7          in fact, it was believed that the

8          organization was low on dope, fat on cash,

9          and ready to make a run to Arizona for more

10         dope.  And that was in large part the reason

11         we brought down the wires, effectuated the

12         search warrants and the arrests, because the

13         government doesn't want to watch $692,000

14         cash walk.  And that, again, a one-time

15         window in a two-week life of this defendant

16         and his drug trafficking conspiracy.

17                   THE COURT:  When you say a two-week

18         window, I assume you're referring to the fact

19         that there was, what, 690-some-thousand

20         dollars seized in the search warrant and your

21         information during this investigation of how

22         frequently would Mr. Molina or someone go to

23         Phoenix to resupply?

24                   MR. HOUGH:  Judge, the-- Mr. Molina

25         in his statement indicated every two to three

1      weeks he went to Arizona on a run.  And

2      that's from Molina's mouth the day of his

3      arrest.  And if the Court will recall, Agent

4      Conde and the interpreter from, and I forget

5      her name, they actually testified in the

6      trial during the day or two, so that is

7      absolutely a matter of record.

8              Additionally, that one event is a

9      level 38.  This defendant's sentence is not

10     just driven by drug quantity, it's driven by

11     role in the offense that the evidence

12     absolutely, positively, shows he's directing

13     Ramiro Soto; Filoberto Ruiz, also known as

14     Beto; Renato Garcia-Medina; Armando

15     Soto-Soto; and Francisco Nunez.  There are

16     five right there.  And we know that there

17     were more based upon the wire calls.

18             As it results to the firearms, that

19     too enhances from the level 38.  The firearms

20     I don't know how it can seriously be argued

21     based upon the state of the record that the

22     defendant did not personally involve himself

23     with firearms during and in relation to and

24     in furtherance of this conspiracy.  That

25     additionally drives this sentence.

1              The importation of methamphetamine

2     was reasonably foreseeable to, if not

3     absolutely directly known, to the defendant

4     based upon the state of the evidence before

5     the Court and based upon the record of his

6     guilty plea.  Those factors, in addition to

7     one quantity on one day drive that.

8              For the defendant to have challenged

9     these are additional factors that the Court

10    must consider in addition to the timing and

11    the context of his guilty plea in this case.

12    To stand before the Court and give a serious

13    straight-face challenge to his role in the

14    offense, the importation of these controlled

15    substances, the present use of facilitation

16    of firearms during in and relation to this,

17    and the foreseeability of the controlled

18    substances on 57th Street in Kansas City,

19    Kansas, defies logic that you can do that and

20    simultaneously accept responsibility for the

21    role this man occupied in this conspiracy

22    during the term that he did.

23             So for those reasons we believe that

24    it is absolutely accurate in the presentence

25    report to assess the leadership role,

1          importation, and the firearms enhancement to

2          the base offense level of 38, and for him not

3          to receive credit for acceptance of

4          responsibility.

5                    Now, the lack of criminal history,

6          frankly, is meaningless in a case involving

7          an individual who is in the country illegally

8          and whose sole support, sustenance, and

9          livelihood is importing controlled substances

10         and selling them and exporting simultaneously

11         firearms and ammunition to his boys in

12         Mexico.  You're not talking about the street

13         corner thug that the agents bought dope from

14         every week for 52 weeks to present to you

15         12 pounds of methamphetamine.  You're talking

16         about the leader or organizer of an

17         organization that has moved a substantial

18         amount of illegal methamphetamine into this

19         country, exported a substantial amount of

20         firearms and ammunition to their colleagues

21         in Mexico, fueling the fire of the situation

22         that counsel referenced to Agent Garman in

23         his cross-examination, the violence and the

24         lawlessness that is currently going on in

25         that country.

74

1                    So for those reasons we believe that

2           it would be a complete miscarriage of justice

3           to grant any type of a variance or downward

4           departure in this matter.  We ask the Court

5           to sentence consistent with the guidelines

6           and consistent with the factors of the

7           statute and impose a sentence of life

8           imprisonment.  Thank you.

9                    THE COURT:  Mr. Kessler, I'll let

10          you have the last word.

11                   MR. KESSLER:  May I respond?

12                   THE COURT:  Yes.

13                   MR. KESSLER:  Judge, first of all,

14          just to note regarding the objection

15          concerning the house on 57th Street in Kansas

16          City, that doesn't have any effect as far as

17          I'm aware on how the guideline range is

18          determined.  And the defendant simply told me

19          he wasn't aware that house was used as a

20          stash house.  So we put that-- I put that in

21          my objections because that was something he

22          believed was wrong in the presentence report.

23          And I don't believe it affects in any way,

24          shape, or form the determination as to what

25          the guideline range will be.

1              I would, however, like to point out

2     that-- discuss a little bit about this

3     Vazquez-Villa case.  I don't want the Court

4     to be misled.  In that case, and I have a

5     transcript of a sentencing here which

6     occurred on June 1st, 2010, Judge Crow found

7     the total offense level was 43.  And I

8     believe he arrived at that, and I don't have

9     the presentence report in that case, but I

10    believe he arrived at that the same way the

11    presentence report in this case arrived at a

12    level 43.  That the amount of drugs gave a

13    base offense level of 38; two points were

14    added because a firearm was involved; and the

15    offense involved importation of

16    methamphetamine so two points were added;

17    four points were added for a role in the

18    offense adjustment in Mr. Vazquez-Villa's

19    case.

20             So Judge Crow, I would submit, did

21    not find that Mr. Vazquez-Villa was less

22    culpable than Mr. Rubio is in this case or

23    other defendants.  As a matter of fact, what

24    Judge Crow stated at the time of sentencing

25    was that the range -- sentencing range --

1          called for by the guidelines fails to account

2          for the defendant's lack of criminal history,

3          puts undue weight on the quantity driven

4          guideline calculations, and overstates the

5          seriousness of the offense due to the nature

6          of the investigation and due to attenuated

7          links with an independent--

8                    THE INTERPRETER:  If it please the

9          Court, the interpreter requests that counsel

10         speak more slowly or provide a copy.

11                   MR. KESSLER:  This is the only copy.

12         I'll slow down.

13                   THE INTERPRETER:  Okay.

14                   MR. KESSLER:  Overstates the

15         seriousness of the offense due to the nature

16         of the investigation and due to attenuated

17         links with an independent drug distribution

18         operation.

19                   I would submit that

20         Mr. Vazquez-Villa was in a very similar

21         position to this defendant except that he

22         concluded his trial.  He did not enter a plea

23         of guilty.  So that's why I'm making an

24         argument regarding sentencing disparity.

25                   If the Court sentences this

1    defendant to life, as the government has

2    requested, I believe that is a disparit

3    sentence than that given to obviously

4    similarly situated defendants in this and

5    associated cases.  Thank you.

6              THE COURT:  Let me ask you a

7    question and then the government can respond,

8    if they know.  Mr. Vazquez-Villa apparently

9    for some period of time was being supplied or

10   was perhaps engaged in somewhat of a joint

11   venture with Mr. Molina and Mr. Rubio-Ayala

12   but then split off and was apparently going

13   to the same people in Phoenix.  But my

14   question is:  Was there any evidence that

15   Mr. Vazquez-Villa was involved in the trading

16   of firearms and exportation of firearms to

17   Mexico?

18             MR. KESSLER:  I-- I don't know, Your

19   Honor.  I-- Mr. Hough tried the case and--

20             MR. GARMAN:  There were not, Your

21   Honor.

22             MR. HOUGH:  Judge, there was no

23   evidence that Vazquez-Villa was exporting

24   firearms and ammunition such as there was

25   here in that trial.  That was not offered.

1      The attenuated links that Judge Crow is

2      talking to there are the attenuated links to

3      this man here.

4              And I would note for the record,

5      with all due respect, the math that counsel's

6      offering, a base offense level of 38, plus

7      two for guns, plus two for importation, plus

8      four for role, get you to 46.  And so there's

9      no way Judge Crow could have arrived at a 43.

10             MR. KESSLER:  That's what it says in

11     the transcript and I don't have the PSI in

12     that case.

13             THE COURT:  Well, except 43 is the

14     maximum.  Even if you calculate 60, it's

15     still ultimately 43.  That's the maximum.

16             MR. KESSLER:  Your Honor, I do know

17     from my review of that case, and as a matter

18     of fact we filed a motion in limine prior to

19     the commencement of trial in this case

20     concerning an issue that the government had

21     raised alleging that threats were made by

22     Mr. Vazquez-Villa, or on his behalf, to

23     witnesses in that case.  And there's no

24     evidence that's occurred here.

25             THE COURT:  Well, reading these

1    reports that are in evidence there is such

2    evidence.  Mr. Heath reports that, I don't

3    know if I can find it, that it wasn't

4    Mr. Rubio-Ayala or Mr. Molina, but one of

5    these other individuals told Mr. Heath that

6    if his name comes out, his family would be

7    killed in Mexico and then he would then come

8    find Mr. Heath and kill him in prison.  This

9    was Alfonso -- who's Alfonso --

10            MR. HOUGH:  The defendant in this

11   case, Judge.

12            THE COURT:  --Alfonso Rubio-Ayala.

13   Yeah, this is in the DEA-6 dated January 5,

14   2010.

15            MR. KESSLER:  Judge, I do recall

16   reading that, and I stand corrected on my

17   statement.

18            THE COURT:  All right.

19            MR. HOUGH:  Judge, as it relates to

20   the evidence of the relation between

21   Vazquez-Villa and Rubio-Ayala and Molina, to

22   clarify the record, could I recall Agent

23   Garman, who was the case agent in that

24   matter, to describe for the record the

25   relationship between Vazquez-Villa and the

1        Molina/Rubio-Ayala organization?

2                    THE COURT:  All right.  Go ahead.

3                    MR. HOUGH:  Just for clarity.

4                    MR. GARMAN:  Do you want me to--

5                    THE COURT:  Mr. Garman, yes, you're

6        still under oath.  You're still under oath.

7                    THE WITNESS:  Thank you, Your Honor.

8                    REDIRECT EXAMINATION

9        BY MR. HOUGH:

10  Q.    You're still under oath.  Sir, you were the

11        case agent in the Vazquez-Villa matter that

12        proceeded to trial with Judge Crow last

13        January, correct?

14  A.    Cocase agent, yes, sir.

15  Q.    Okay.  And during the course of that trial,

16        Judge Crow recognized you as an expert in

17        drug trafficking investigations, generally in

18        methamphetamine investigations specifically,

19        correct?

20  A.    I believe so, yes, sir.

21  Q.    Now during the course of the investigation of

22        that and the Molina/Rubio-Ayala organization,

23        can you describe for the Court and the record

24        the extent to which, if any, there was

25        overlap in that relationship?

1   A.   I can.  There was another individual that

2        hasn't been discussed and his name is Rito

3        Garcia.  Rito-- initially Mr. Molina worked

4        for Rito up until I believe 2006.  Rito was

5        responsible for the contacts with sources in

6        Arizona and potentially other places.  And up

7        until approximately 2006 Mr. Molina

8        apparently transported drug proceeds and

9        narcotics to and from specifically Phoenix,

10       Arizona, to Kansas at the direction of Rito.

11            Mr. Molina was interdicted in the

12       State of New Mexico with a sum of

13       U.S. Currency that was drug proceeds of

14       Rito's travelling from Kansas to Phoenix.

15       When that money was seized, as oftentimes

16       happens, Mr. Molina was not arrested because

17       there was no criminal charge on a simple

18       traffic stop with money.  So he was released.

19            Rito became suspicious of

20       Mr. Molina, thinking that he was cooperating

21       with law enforcement, I believe, because he

22       never went to jail and the money was seized

23       and/or the fact that he thought Mr. Molina

24       had potentially taken the money from him, as

25       I've heard from other sources.

82

1              That pretty much ended their

2      relationship in narcotics trafficking

3      together.  However, Mr. Molina had already

4      become acquainted with the sources of supply

5      in the Phoenix area.  And sometime shortly

6      after that Mr. Molina began transporting

7      narcotics for himself to distribute to and

8      from Phoenix, Arizona, to Kansas.

9              Pascual Vazquez-Villa was still,

10     during this investigation, working for Rito.

11     So essentially Mr. Molina had worked under

12     Rito up until 2006.  And then when their

13     disagreement occurred he began to take the

14     role similar to what Rito had.  They just

15     kind of split.

16              So you had Molina and Pascual

17     working for Rito, and then you have

18     Mr. Molina and Mr. Ayala doing the same thing

19     Rito had been doing with the connection in

20     Phoenix.

21              THE COURT:  So essentially it became

22     two conspiracies.

23              THE WITNESS:  They did.  Exactly.

24     However, they knew each other and there were

25     some family associations and ties between

1          Mr. Molina and Rito.  Essentially they

2          resided in the same town, in Great Bend,

3          Kansas, which is not very large, and many

4          people know each other, especially being

5          narcotics traffickers.

6                    Pascual distributed and transported

7          drugs for Rito, as did Adan for himself.  And

8          when Pascual had had problems with quality of

9          some methamphetamine, he did call upon

10         Mr. Molina to obtain perhaps a better quality

11         of methamphetamine or a different-- well,

12         locating methamphetamine in an attempt to

13         satisfy a specific customer, as described by

14         Mr. Hough earlier.

15                    MR. HOUGH:  Judge, I hope that

16         clarifies to the Court.  That's all the

17         questions I have unless the Court has

18         additional questions.

19                    THE COURT:  Mr. Kessler may have

20         additional questions.

21                       RECROSS-EXAMINATION

22         BY MR. KESSLER:

23    Q.   Mr. Molina is the one that was stopped and

24         the one Rito became suspicious of; is that

25         correct?

1   A.   Yes, sir, it is.

2   Q.   He then, according to your testimony, started

3        picking up drugs for himself and selling

4        them?

5   A.   That is correct.  For his organization.

6   Q.   All right.  And Mr. Rubio-Ayala worked for

7        him--

8   A.   No.

9   Q.   --did you say?

10  A.   They worked together.  There was no

11       distinction of who was in charge of the other

12       between Molina and Ayala.  At times during

13       the investigation we believed that perhaps

14       Mr. Molina was the leader and that Mr. Ayala

15       played more of a distribution role locally

16       within Kansas and Missouri and collection of

17       proceeds.  However, their conversations were

18       more of a business partnership consulting

19       upon one another in their direction.

20            And specifically in December of

21       2008, when Mr. Molina was having trouble

22       arranging to obtain methamphetamine from

23       Arizona, Mr. Ayala called upon two other

24       sources of supply, one being in Kansas City

25       and one having discussions through a

1          third-party within Topeka, and in fact did

2          obtain additional methamphetamine to satisfy

3          their customers, and continued the

4          trafficking organization until the troubles

5          in Phoenix could be mended and the normal

6          transportation routes of methamphetamine

7          could be satisfied.

8     Q.   So is your belief different now than it was

9          at the time of the trial of Pascual

10         Vazquez-Villa?  At that time the government

11         argued that he, Adan Molina, and Alfonso

12         Rubio-Ayala were all the same.  Three leaders

13         of an organization.  Is that different?  Have

14         you come to a different conclusion now?

15    A.   I did not come to that conclusion.  The

16         government may have.  I don't know

17         specifically what was stated.  I can tell you

18         that Rito was in charge of Pascual and that

19         Adan Molina and Rubio-Ayala, based upon my

20         involvement for nearly a year with this case

21         through the intercepts, through the

22         surveillances, through the proffers and all

23         actions that we've discussed, believe, as

24         does my cocase agent, that Molina and Ayala

25         were equal partners in their side of the

```
 1          trafficking organization.
 2    Q.    All right.
 3                 MR. KESSLER:  I have no other
 4          questions, Your Honor.
 5                 THE COURT:  Anything more?
 6                 MR. HOUGH:  Just one point.
 7                    REDIRECT EXAMINATION
 8    BY MR. HOUGH:
 9    Q.    So out of Arizona you would have had the same
10          source to Vazquez-Villa and Rubio-Ayala and
11          Molina; is that correct?
12    A.    Excuse me now?
13    Q.    Out of one source in Arizona it would have
14          provided to a/leader organizer Vazquez-Villa
15          and a separate leader organization,
16          Molina/Rubio-Ayala; is that correct?
17    A.    That is correct.  Except Pascual did not
18          arrange with the guys in Phoenix.  Rito did.
19          Pascual drove and got it as Rito followed him
20          and oversaw everything.  Rito actually
21          arranged for everything in Phoenix.  Pascual
22          just made the trips for him.  They drove
23          separate vehicles and transported the drugs
24          back.
25    Q.    Okay.  But Rito-- but you have two separate
```

87

1        organizations?

2   A.   That is correct.  But Rito led Pascual.

3   Q.   Okay.  And Pascual lead five or more other

4        people that were identified during the trial

5        of that matter, correct?

6   A.   Yes.  He had numerous people that assisted

7        his distrubution through Rito.

8   Q.   Thank you.

9                MR. HOUGH:  That's all I have,

10       Judge.

11               THE COURT:  All right.  You can step

12       down.

13               THE WITNESS:  Thank you, Your Honor.

14               THE COURT:  All right.  I'll take up

15       these objections.  First of all, there's an

16       objection to not receiving acceptance of

17       responsibility.  This is really I think a

18       discretionary call because this defendant did

19       not plead guilty until trial had commenced.

20       And that's not necessarily definitive.  But

21       ordinarily acceptance of responsibility, at

22       least two points, is available when someone

23       accepts responsibility before the government

24       has been put to the burden of producing

25       evidence at trial, which the government was

88

1           at this point in this case.

2                   The government, as Mr. Kessler

3           pointed out, would have had to do that

4           anyway.  There were two other defendants that

5           went to trial.  Pleading guilty by all three

6           defendants in fact this first week of trial

7           saved the government considerable time in

8           terms of a six-week trial.  So the Court is

9           inclined to give Mr. Rubio-Ayala some benefit

10          of that.

11                  On the other hand-- I'm just telling

12          you the things that weigh on the side.  On

13          the other hand, Mr. Rubio-Ayala has accepted

14          responsibility for the undercover sales he

15          made to Mr. Garman.  He's accepted

16          responsibility for being a part of this

17          conspiracy, but he's not accepted

18          responsibility for some aspects that are at

19          issue today.

20                  On balance, the Court is inclined to

21          give Mr. Rubio-Ayala a two-level mitigation

22          for pleading guilty, something the Court

23          typically is reluctant to do once a trial

24          starts.  But given the length and scope of

25          this trial, the Court will give

1          Mr. Rubio-Ayala two levels off for that.

2                    With respect to the objection to the

3          firearm enhancement, the Court overrules and

4          denies that objection.  There is sufficient

5          evidence by more than a preponderance of the

6          evidence that this conspiracy involved

7          firearms in numerous ways.  It involved

8          firearms, it's clear, from the result of the

9          search warrant.  The conspiracy involved

10         firearms in the traditional sense of having

11         them there at the stash house to protect the

12         assets of this organization -- the drugs, the

13         money, the cooking operations.  There were

14         firearms seized from these residences.  There

15         was a firearm, for that matter, seized from

16         Mr. Rubio-Ayala's residence, although there

17         weren't significant amounts of currency or

18         drugs found there.

19                    But this conspiracy involved

20         firearms, in the Court's mind, in even more

21         troubling ways.  And that is that firearms

22         were used as currency to procure drugs.  And

23         definitely more troubling, in the Court's

24         mind, is that firearms were shipped to Mexico

25         to supply cartel activity there, which

1    undoubtedly contributed to violent acts,

2    fatalities, terror.  The very activity that

3    causes some people to leave Mexico illegally

4    and come here was supported by these

5    defendants shipping what they called shit

6    loads of firearms to Mexico.

7            So it's clear to the Court that

8    firearms were part of this conspiracy, that

9    it was foreseeable to Mr. Rubio-Ayala by

10   virtue of the wiretapped conversations that

11   Mr. Garman just gave us a sample of that

12   Mr. Rubio-Ayala was intimately involved in

13   the procurement and sale and barter of

14   firearms.  So that objection is overruled and

15   denied.

16           The objection to importation is

17   overruled and denied.  Although Mr. Molina

18   travelled to Arizona, and that's where his

19   suppliers were physically located, this

20   conspiracy involved the procurement of drugs

21   from Mexico to those people in Arizona where

22   Mr. Molina picked them up.  This wasn't the

23   typical situation where someone has a

24   supplier in the United States and that

25   supplier perhaps in turn imports their drugs.

1       This conspiracy involved these individuals,

2       Mr. Molina and Mr. Rubio-Ayala, having both

3       direct and indirect contact with people in

4       Mexico.  And even though they didn't bring

5       the drugs in themselves, they procured the

6       drugs and knew they were coming from Mexico.

7               And part of the reason they were

8       shipping drugs across the border to Mexico

9       was to procure these drugs.  People that

10      worked directly for Mr. Molina and

11      Rubio-Ayala were involved in the importation

12      and exportation of firearms.  All of this,

13      the Court finds, is strong evidence that

14      Mr. Molina and Mr. Rubio-Ayala were actually

15      importing drugs from Mexico.  Although they

16      didn't physically bring them across

17      themselves.  Somebody else did that.  And

18      then they in turn picked them up from those

19      people in Phoenix, Arizona.  And the drugs at

20      issue are methamphetamine, so that particular

21      sentencing guideline enhancement does in fact

22      apply.  That objection is overruled and

23      denied.

24              The role in the offense objection is

25      also overruled and denied.  Based on the

1          evidence at trial, there was a number

2          of-- the evidence at trial was in the form of

3          circumstantial evidence that was seized from

4          a number of locations that were tied to

5          Mr. Molina and Mr. Rubio-Ayala or both.  And

6          that circumstantial evidence showed that

7          there were a number of people involved in

8          this organization in a variety of roles

9          working underneath Mr. Molina and

10         Mr. Rubio-Ayala.

11                  The evidence seized from the search

12         warrants tied these locations together

13         circumstantially by virtue of the somewhat

14         unique method of packaging and packaging

15         materials involving aluminum foil, by such

16         evidence as the narco saints items that were

17         seized from these houses, various receipts

18         and pieces of paper and car titles and

19         registrations that tied these locations

20         together, and then the statements of the

21         cooperating subjects in this case that showed

22         that Mr. Rubio-Ayala and Mr. Molina were

23         partners.  Neither was above either.  They

24         played symbiotic roles.

25                  Mr. Molina had more of a direct role

1      in going to Phoenix to pick up the drugs, but

2      Mr. Rubio-Ayala was aware of that and knew

3      about that and at one point obtained an

4      alternate source of supply when the source of

5      supply was at risk because of some sort of

6      relational problems.  Both Mr. Rubio-Ayala

7      and Mr. Molina had a number of people working

8      underneath them.  Based on all of the

9      evidence, there were more than five people

10     that worked for Mr. Rubio-Ayala and/or

11     Mr. Molina.

12          But specific to Mr. Rubio-Ayala, the

13     Court finds that Armando Soto-Soto, Francisco

14     Nunez, Renato Garcia-Medina, Filoberto Ruiz,

15     Ramiro Soto, that's five alone that worked

16     for Mr. Rubio-Ayala.  We can include

17     Mr. Heath, who was procuring firearms for

18     them.  That's six.  I could go on.  But it's

19     clear to the Court that-- well, there was

20     also this Mr. Chavez, who was purportedly a

21     firearms dealer, that was procuring firearms

22     for Mr. Rubio-Ayala.  So there were clearly

23     more than five people that were being

24     directed by Mr. Rubio-Ayala.  So the role in

25     the offense objection is overruled and

1    denied.

2         Finally, there's this objection that

3    Mr. Rubio-Ayala says he was unaware of the

4    stash house on North 57th Street.  That does

5    not affect the Court's calculations.  But the

6    Court, nonetheless, overrules and denies that

7    because there is plenty of evidence in the

8    form of statements by cooperating subjects

9    that show that Mr. Ayala was aware of the

10   stash houses.  There were multiple ones,

11   including the one on 57th Street.

12        Mr. Garcia-Medina resided at that

13   house in winter 2009, and Mr. Garcia-Medina

14   was directed by Mr. Molina as well as

15   Mr. Rubio-Ayala.  In fact, Mr. Garcia-Medina

16   stated that he came from Mexico specifically

17   to work for Mr. Molina and Mr. Rubio-Ayala,

18   to sell their drugs for them.

19        So given all of these things, the

20   guideline calculations are as follows.  The

21   base offense level is 38.  And let me say

22   about the calculation of the base offense

23   level, that's based on more than 1.5

24   kilograms of actual methamphetamine.  That

25   calculation is based on the seizure of drugs

1     from the search warrant I believe at the

2     Eaton address.  It does not at all take into

3     account how the $692,000 would have

4     translated into more drug amounts.  But the

5     government's calculation with a conservative

6     wholesale value of 16,000 per kilo, that

7     would have been another I believe-- I know

8     another 43 pounds.  So about another 19 kilos

9     of a mixture of methamphetamine.  But that's

10    not even taken into account into this

11    calculation.

12          Nor does this calculation take into

13    account the fact that over a year this

14    organization was operating and that there

15    were a number of cooperating subjects that

16    provided information about the amounts of

17    drugs they knew that these two men were

18    procuring.  And some of whom were in turn

19    procuring drugs directly from these men to

20    sell.  So, for example, Mr. Heath, who was

21    being supplied on a regular basis by these

22    individuals, those amounts aren't taken into

23    account.

24          So as the government posits, the

25    base offense level really is based solely

1          upon the amount of drugs seized on a

2          particular date at one of the locations

3          involved in the organization.  And by

4          Mr. Molina's admission, they were resupplying

5          about every two or three weeks.  So this base

6          offense level is just a very small tidbit of

7          the volume of drugs that this organization

8          was involved in selling.

9               In that sense it isn't the situation

10         that it's a prolonged investigation involving

11         a number of small sales that ratchets up the

12         guidelines simply because the investigation

13         isn't stopped.  This is-- this was a very

14         significant organization that imported drugs

15         from Mexican cartel, traded firearms

16         illegally, and that operated for at least a

17         year in very significant amounts of drugs

18         that aren't even taken into account in

19         calculating these guidelines.

20              To this base offense level of 38 is

21         added four levels, two for the possession of

22         firearm, two for importation of

23         methamphetamine, another four for adjustment

24         or role in the offense, for an adjusted

25         offense level of 46.  Giving Mr. Rubio-Ayala

1        two levels off for acceptance of

2        responsibility, the total offense level is

3        44, which exceeds what the guidelines allow,

4        which is 43.  So the total offense level is

5        43.  The criminal history category is 1.

6              Mr. Ayala has asked for a variance

7        on the basis of the guidelines being driven

8        by the drug amounts.  I've already addressed

9        that in the sense that the guidelines only

10       capture a very minor amount of the drugs

11       involved here.

12             Also on the basis that he has no

13       criminal history.  And with this guideline

14       level, the criminal history, or lack thereof,

15       is not really taken into account because this

16       guideline level comes out at life.  And the

17       Court has given great consideration to that

18       but ultimately decided not to vary this

19       sentence.

20             The Court finds this to be a very

21       significant organization, finds

22       Mr. Rubio-Ayala's leadership of this

23       organization to be significant, finds the

24       direct and indirect effects on this community

25       to be significant, finds the trading of

1      firearms with Mexican cartels to be

2      significant.  All of these factors lead the

3      Court to find that as troubling as it may be

4      to sentence someone at Mr. Rubio-Ayala's age

5      to life, the Court finds that

6      Mr. Rubio-Ayala's criminal activity has had

7      dire and horrific effects in the United

8      States and probably even more dire and

9      horrific effects in Mexico that are related

10     to what's happening in the United States.

11            All that is troubling and-- all that

12     is troubling and of concern concerning the

13     distribution of drugs is evident and existent

14     in this case.  And although these sentencing

15     guidelines lots of arguments can be made that

16     sometimes these calculations are just extreme

17     and outrageous, in this particular case, the

18     Court finds that the guidelines are not

19     overstated when the Court considers all of

20     the stated and even unstated effects of this

21     drug organization.  The Court thinks even

22     though this is an extreme sentence, it is

23     well warranted and justified, all things

24     considered.

25            So the statute provides for not less

1    than 10 years and not more than life in

2    prison.  The guidelines advise life.  The

3    Court's tentative sentence is life.  This

4    defendant is not eligible for probation.  The

5    Court intends to sentence a five-year term of

6    supervised release, which, of course, is

7    academic in this case.  The guidelines advise

8    five years.  The statute not less than five

9    years.

10            The Court does not intend to impose

11   a fine.  The maximum fine under the statute

12   is $4 million and the guideline range is

13   25,000 to $4 million.

14            Restitution is not applicable.

15            The statute and guidelines call for

16   a $100 special assessment.

17            There is a provision for denial of

18   federal benefits for up to one year under

19   statute or guidelines, but the Court does not

20   intend to apply that.

21            The Court does intend to impose each

22   of the mandatory and special conditions of

23   supervision set forth in part D of the

24   presentence report.

25            The Court is required to impose a

1    sentence that is sufficient, but not greater

2    than necessary, to comply with the purposes

3    of sentencing identified in the statute.   In

4    determining the particular sentence to be

5    imposed, the Court has considered the

6    statements of the parties, the plea

7    agreement, and the facts in the presentence

8    investigation report.

9         The Court has considered the nature

10    and circumstances of the offense.   There were

11    over 30 defendants arrested in connection

12    with this conspiracy.

13         The Court has considered the history

14    and circumstances of the defendant.   The

15    defendant was born in Mexico.   He has a

16    pending ICE detainer.   He has three children

17    and is in the middle of divorce proceedings.

18    His wife is also a codefendant in this

19    matter.   He reports he does not have a

20    substance abuse problem, but he would like to

21    receive treatments to help him abstain from

22    drug use.   He has no prior criminal

23    convictions.

24         Although only advisory, the Court

25    has given consideration to the sentencing

1        guidelines.  The Court views the guidelines

2        as an instrument in determining a sentence

3        because they promote uniformity in sentencing

4        by weighing the basic nature of the offense

5        as well as aggravating and mitigating

6        factors.

7                The Court did compare this defendant

8        to Mr. Vazquez-Villa and determined that this

9        defendant is more culpable than

10       Mr. Vazquez-Villa because this defendant and

11       Mr. Molina were directly working with the

12       Arizona suppliers as well as the Mexican

13       cartel.  Mr. Vazquez-Villa was working for

14       Mr. Rito, who was at the same level as this

15       defendant and Mr. Molina.

16               After reviewing all of these things,

17       the Court finds a sentencing guideline range

18       of life is correctly calculated and is

19       reasonable.  The Court believes this sentence

20       represents a sentence that appropriately

21       addresses all of the sentencing factors to be

22       considered.  It reflects the seriousness of

23       the offense, promotes respect for the law,

24       provides just punishment, definitely affords

25       adequate deterrence, and protects the public

1          from any further crimes of this defendant.

2                     A five-year term of supervised

3      release following confinement will allow the

4      defendant the opportunity to receive

5      correctional treatment in an effective manner

6      and assist with community reintegration in

7      accordance with the statute, should he be

8      released.

9                     The defendant is prohibited by

10     federal law from possessing or purchasing a

11     firearm or other dangerous weapon as a result

12     of this conviction.  Because the defendant

13     has been convicted of a felony offense, the

14     mandatory conditions for drug testing and DNA

15     collection are imposed pursuant to 18 U.S.C.

16     Section 3583(d).  Based on his history of

17     substance abuse and the instant offense,

18     conditions requiring substance abuse

19     treatment and alcohol prohibition are all

20     warranted.

21                    The defendant shall pay child

22     support in accordance with any plan

23     established by state authorities.

24                    He shall surrender to immigration

25     officials for possible deportation, should he

1          ever be released from custody.

2                    And due to the nature of the offense

3          and potential danger related to the charges,

4          a condition allowing the search of the

5          defendant's home is warranted.

6                    Based on the lack of financial

7          resources identified in the presentence

8          report, the Court will not impose a fine, but

9          the defendant is required to satisfy a

10         special assessment of $100 pursuant to

11         18 U.S.C. Section 3013.

12                   The defendant has been incarcerated

13         since June 17, 2009.  He is not an

14         appropriate candidate for voluntary

15         surrender.

16                   Are there objections by the

17         government?

18                   MR. HOUGH:  No, Your Honor.

19                   THE COURT:  All five objections of

20         the defendant are preserved for the record.

21                   Any other objections, Mr. Kessler?

22                   MR. KESSLER:  No, Your Honor.  I

23         would like for the record to be clear though

24         on the defendant's right to allocution and

25         make sure at some point that he doesn't wish

1          to address the Court.

2                    THE COURT:  Yes.  I'll call on him

3          now.

4                    Mr. Rubio-Ayala, it's your right to

5          address the Court directly in your own behalf

6          if you would like to.  You don't have to, but

7          if you would like to the Court will hear from

8          you at this time.

9                    THE DEFENDANT:  No, that's fine.

10                   THE COURT:  All right.  The Court

11         determines that the presentence investigation

12         report, as corrected or modified by the

13         Court, and the previously stated findings are

14         accurate and orders those findings

15         incorporated in the following sentence.

16         Pursuant to the Sentencing Reform Act of

17         1984, it is judgment of the Court that the

18         defendant, Alfonso Rubio-Ayala, is hereby

19         committed to the custody of the Bureau of

20         Prisons to be imprisoned for a term of life.

21                   Should he be released from

22         imprisonment, the defendant shall be placed

23         on supervised release for five years.

24                   Within 72 hours of release from the

25         custody of the Bureau of Prisons, the

1          defendant shall report in person to the

2          probation office in the district to which he

3          is released, if he is not deported.  While on

4          supervised release, the defendant shall not

5          commit another federal, state, or local

6          crime; shall comply with the standard

7          conditions that have been adopted by this

8          Court; and the mandatory and special

9          conditions previously stated by the Court.

10               The defendant is ordered to pay a

11          special assessment of $100 through the clerk

12          of the U.S. District Court.  Payments on the

13          special assessment shall begin immediately

14          and may be made while in Bureau of Prisons

15          custody.

16               A fine in this case is hereby

17          waived.

18               Voluntary surrender is denied and

19          the defendant is remanded to the custody of

20          the U.S. Marshal pending designation by the

21          Bureau of Prisons.

22               Both the government and defendant

23          are advised of their respective rights to

24          appeal this sentence and conviction.  An

25          appeal taken from this sentence is subject to

1      18 U.S.C. Section 3742 and subject to any

2      waiver in the plea agreement in this case.

3      The defendant is advised that it is your

4      right to appeal the conviction and sentence

5      but only to the extent you have not waived

6      that right in the plea agreement.

7              You also can lose your right to

8      appeal if you do not timely file a notice of

9      appeal in the district court.  Rule 4(b) of

10     the Federal Rules of Appellate Procedure

11     gives you 14 days after the entry of judgment

12     to file a notice of appeal.  If you so

13     request, the clerk of the court shall

14     immediately prepare and file a notice of

15     appeal on your behalf.  If you are unable to

16     pay the cost of an appeal, you have the right

17     to apply for leave to appeal in forma

18     pauperis.

19             All right.  I show the indictment

20     and all remaining counts of the superseding

21     indictment are subject to dismissal.

22     Correct?

23             MR. HOUGH:  Yes, Your Honor, and we

24     would so move at this time.

25             THE COURT:  All right.  Those will

1          be dismissed.

2                    Mr. Rubio-Ayala, it's a very

3          difficult thing for the Court to sentence

4          anyone to this sentence.  But I hope you

5          understand that because of all that you've

6          done you really have blood of others on your

7          hands.  There are people that aren't living

8          on this earth, I'm pretty sure, as at least

9          an indirect result of the organization that

10         you chose to lead.

11                   And the only thing the Court can say

12         is as much at the Court wishes that this was

13         not the result for anyone, much less you,

14         from all that I know, perhaps life really

15         means life.  You're not going to go back to

16         Mexico and probably die at the hands of the

17         people that you were dealing with there and

18         you really are going to live out a long life

19         even though it's in custody the whole time.

20         I think it's very likely that if you were

21         deported to Mexico you would be killed.

22         That's the nature of the business that you

23         were involved in.

24                   And I know that you're a family man

25         and I know that you have children, and I feel

1      very sorry for your children.  And I only

2      hope that your wife, who's here in the

3      courtroom, understands that she was given the

4      deal of a lifetime.  Because she knew what

5      was going on, even if she didn't know the

6      full scope of it.

7              And if she doesn't turn her life

8      around and become the mother that she needs

9      to, I feel even sorrier for your children.

10     They didn't deserve either one of you.  But

11     that's what they got.

12             So she sits her crying and feeling

13     sorry for you and feeling sorry for herself.

14     I hope that she'll turn that around and do

15     right by your children so that at least you

16     know your children are well taken care of

17     while you're in prison.  As we sit here now,

18     I'm not sure that they're in good hands.  But

19     hopefully they are.

20             All right.  Court will be in recess

21     until 2 o'clock.

22                 (THEREUPON, the hearing

23     concluded).

24

25

```
1        UNITED STATES OF AMERICA  )
                                   )    ss:
2        DISTRICT OF KANSAS        )

3

4                     C E R T I F I C A T E

5

6            I, Sherry A. Harris, Certified Shorthand

7        Reporter in and for the State of Kansas, do

8        hereby certify that I was present at and

9        reported in machine shorthand the proceedings

10       had the 24th day of January, 2011, in the

11       above-mentioned court; that the foregoing

12       transcript is a true, correct, and complete

13       transcript of the requested proceedings.

14           I further certify that I am not attorney

15       for, nor employed by, nor related to any of

16       the parties or attorneys in this action, nor

17       financially interested in the action.

18           IN WITNESS WHEREOF, I have hereunto set

19       my hand and official seal at Topeka, Kansas,

20       this 22nd day of February, 2011.

21

22                        /s/ Sherry A. Harris
                          Certified Shorthand Reporter
23

24

25
```