# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff/Respondent ) <br> ) <br> v. ) <br> ) <br> ALFONSO RUBIO-AYALA, ) <br> ) <br> Defendant/Movant ) <br> ) | Case No. 09-40041-02-JAR <br> Case No. 12-4139-JAR |

## MEMORANDUM AND ORDER

This matter is before the Court on Petitioner Alfonso Rubio-Ayala's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody (Doc. 441). In his motion, Petitioner seeks relief on two grounds that he was denied effective assistance of counsel with respect to his plea negotiations and waiver. The Government has responded (Doc. 449). The Court held an evidentiary hearing on April 15, 2014. After the hearing the Government filed an unopposed Motion to Supplement Record (Doc. 455), which the Court grants. Counsel for Petitioner was granted additional time to review evidence, and has advised the Court that he does not intend to submit a supplemental brief. Having carefully reviewed the record and the arguments and evidence presented, the Court denies Petitioner's motion.

## I.  Factual and Procedural Background

On April 15, 2009, Petitioner was indicted on forty-nine counts of methamphetamine trafficking offenses against nine defendants; a superseding indictment was filed on April 7, 2010, and contained 63 counts against seven defendants. In Count One, Petitioner was charged

with conspiracy to possess with intent to distribute 500 grams or more of methamphetamine; the superseding indictment also included multiple counts of using a communication facility in committing and facilitating the conspiracy as well as distribution and possession of methamphetamine, conducting a financial transaction affecting interstate commerce, attempting to travel from Kansas to Arizona with the intent to promote, manage, establish and carry on the conspiracy, distribution of methamphetamine, and possession of firearms by illegal aliens.[1] Petitioner was represented throughout these proceedings by Stephen Kessler. As discussed herein, prior to trial, Petitioner rejected several plea agreements proposed by the Government.

On November 1, 2010, a jury trial commenced against Petitioner and his remaining co-defendant, Aden Molina.[2] On November 4, 2010, after several Government witnesses had testified and evidence was presented regarding the execution of search warrants on Petitioner and co-defendant's houses, Petitioner entered a guilty plea to Count One of a Superceding Indictment charging him with conspiracy to possess with the intent to distribute and dispense more than 500 grams of methamphetamine, in violation of 21 U.S.C. § 846.[3] In the Plea Agreement, Petitioner waived various collateral and appellate rights.[4] On January 24, 2011, this Court sentenced Petitioner to a term of imprisonment of life, for this offense.[5]

Petitioner filed a direct appeal to the Tenth Circuit Court of Appeals, and that court

---

[1] Doc. 143.

[2] Doc. 284. Petitioner's other co-defendant and wife, Kelly Rubio, entered a plea the morning trial started; co-defendant Molina entered a guilty plea on November 4, 2010. Doc. 292.

[3] Doc. 289.

[4] *Id*. at 17, ¶ 11.

[5] Doc. 341.

granted the Government's motion to enforce the plea agreement and dismissed his appeal on June 23, 2011.[6] The Tenth Circuit issued its mandate on July 15, 2011.[7] On September 20, 2011, Petitioner filed a petition for writ of certiorari with the United States Supreme Court, which denied his petition on November 7, 2011.[8]

Petitioner filed this timely § 2255 Motion on October 29, 2012, alleging ineffective assistance with respect to his plea negotiations and waiver of post-petition conviction rights in the Plea Agreement on two grounds.[9] First, he claims at some point during plea negotiations, the Government offered him a plea deal that did not require his testimony or cooperation that would have resulted in his serving a sentence of approximately fourteen years, which he rejected, and that counsel "was ineffective for failing to ensure that [he] understood the factual claims and how his own admissions made him guilty at the time when the government offered a plea deal of around 14 years, or otherwise when the possible sentence included an amount of less than life."[10] Second, Petitioner asserts that his counsel ineffectively failed to explain the nature and consequences of the appellate waiver provision in the Plea Agreement.[11] By way of relief, Petitioner requests that this Court vacate his guilty plea and "permit him to plead guilty as if he were pleading guilty at a time when the government offered a deal with stipulations for a

---

[6]*United States v. Rubio-Ayala*, 435 F. App'x 755 (10th Cir. June 23, 2011) (granting Government's motion to dismiss appeal based on appellate waiver in Plea Agreement).

[7]Doc. 412.

[8]Doc. 433.

[9]Doc. 441. 28 U.S.C. § 2255(f)(1) ("A 1-year period of limitation shall apply to a motion under this section. The limitation shall run from . . . the date on which the judgment of conviction becomes final.").

[10]Doc. 441 at 4.

[11]*Id.* at 5.

3

sentence of about 14 years,"[12] or, failing that, to "reinstate his appellate rights without the appellate waivers in place."[13]

As requested, the Court takes judicial notice of the affidavits attached to the parties' respective briefs. Petitioner avers:

> During the plea negotiations prior to trial, in addition to the offer of a cooperation agreement, the Government also offered a plea deal that would not require me to testify against [co-defendant] Adan Molina. My attorney Stephen Kessler said that I would receive a sentence of around 14 years if I took that offer. At the time, that seemed like a lot of time for what I had done, but my attorney had never explained to me that in a conspiracy, I could be held responsible for the actions of my co-conspirators, including those I didn't even know. While my attorney showed me the statements that other individuals had made against me, I did not understand what they really said because my attorney never discussed the case through an interpreter and I didn't understand what he was saying. He also never provided me with copies of discovery so that I could get the documents translated on my own. If I had known what those statements and reports had specifically said and if I had understood the legal concepts of conspiracy law and vicarious liability, I would have accepted the 14-year plea offer when it was originally offered by the Government and would have pleaded guilty to the conspiracy at that time.[14]

Stephen Kessler submitted an affidavit setting out his version of events leading up to Petitioner's rejection of several plea offers:

> Immediately after being appointed to represent Mr. Rubio-Ayala I discussed with him the need for an interpreter. I do not speak Spanish. I was made aware that English was not Mr. Rubio-Ayala's first language but he spoke English well and specifically told me that he did not believe an interpreter or translator was necessary. During the course of my representation I met with Mr.

---

[12]*Id.* at 4.

[13]*Id.* at 5.

[14]Declaration of Alfonso Rubio-Ayala, Doc 441-1.

4

Rubio-Ayala on numerous occasions to discuss the case and to review discovery materials and he never requested the assistance of an interpreter. He participated in our discussions and I believe he understood those discussions.

Subsequent to my appointment as counsel and prior to the commencement of trial in this case I engaged in plea negotiations on Mr. Rubio-Ayala's behalf with the government. It is my recollection that plea agreements were offered on several occasions and most included a requirement of cooperation by the defendant to obtain any recommendation of a significant reduction in the sentence sought by the government.

Mr. Rubio-Ayala rejected all plea proposals and stated that he would not cooperate with the government or provide information or testimony against others alleged to be involved in some of the offenses with which he was charged. He rejected at least one offer which included a recommendation for a reduced sentence and did not include the requirement that he testify or provide information about the involvement of others. He maintained this position in spite of my frequent advice that in my opinion the evidence against him was strong and conviction at a trial was likely.

I met with Mr. Rubio-Ayala on numerous occasions to review information and statements received in discovery. He was allowed to review written statements and documents and to listen to recorded conversations. Copies of most of these materials were not left with him at the CCA Detention Facility because of the government's requirement that in exchange for full discovery counsel agree not to leave copies with a defendant in custody.

I discussed with Mr. Rubio-Ayala the elements of the offenses against him including conspiracy and the operation and application of the sentencing guidelines in this case. He stated that he understood and I believed he did, but he also stated that he had no desire to plead guilty to any of the offenses charged.

I certainly joined Mr. Rubio-Ayala's desire for a shorter sentence and did my best to convince him before trial that the best way to achieve that goal was to admit guilt and cooperate with the government. Even though we had repeatedly reviewed and discussed the evidence that would be presented, including evidence of sales to undercover police officers and incriminating statements obtained in wiretaps from co-conspirators, I don't think

> it really sunk in until the defendant heard it in court. It was very frustrating to me that he wouldn't seriously consider a plea and cooperation prior to trial and I told him on several occasions that was, in my opinion, the only way to realistically expect a shorter sentence. I am fully aware that the current drug laws and the manner in which they are enforced make the negotiations of plea agreements a matter of utmost importance in cases such as this one and did my best to impress that on the defendant.[15]

On April 15, 2014, the Court held an evidentiary hearing on the question of whether counsel was ineffective in assisting Petitioner in plea negotiations with the Government as well as in executing the waiver provisions in the Plea Agreement. Testimony was, for the most part, in alignment with what Petitioner and Mr. Kessler submitted in their respective affidavits. Petitioner testified that he moved to the United States from Mexico in 2001, and he does not speak or understand English well. He further testified that Mr. Kessler conferred with him about his case four times while he was held at CCA, for fifteen to twenty-minute sessions. Petitioner claims that he did not understand the evidence Kessler brought for him to look at and that he told Kessler that "it would be a lot better" for him if Kessler brought an interpreter to the out-of-court sessions. Petitioner claims that he has "no clue" what the sentencing Guidelines are, and that Kessler never explained that the drug amounts involved in the case could raise his sentence to life.

With respect to the Plea Agreement he entered after several days of trial, Petitioner testified that he asked Kessler for an interpreter, but was told there was no time and that the prosecutor could change his mind. Petitioner testified that Kessler read him the agreement in English and explained that he thought it was unlikely Petitioner would receive a life sentence

---

[15]Doc. 449, Ex. 1.

because this was his first offense. Petitioner also testified that he did not understand that he was waiving his right to collaterally attack or appeal his conviction, that no one read the Agreement to him in Spanish, and that he would not have signed it if he had understood what he was giving up. Petitioner testified that he understood the firearms counts would be dismissed pursuant to the Plea Agreement, but did not understand that they could be included as relevant conduct at sentencing, going so far as to claim Mr. Kessler did not discuss relevant conduct with him at all.

On cross-examination by the Government, however, Petitioner admitted that during trial, there were two interpreters available the entire court day, including the morning he plead guilty. Petitioner also admitted that the Plea Agreement stated that he had read, understood and discussed the plea with counsel, that he signed under oath that the answers he gave were true and correct, that he was satisfied with his attorney's representation, that the agreement specifically stated that the maximum sentence he could receive was life imprisonment, and that counsel advised him on the nature of the charges and discussed the sentencing Guidelines. Petitioner acknowledged that the Court questioned him extensively on the circumstances of the Plea Agreement, including that the Court was not bound by the Agreement, that his sentence would be between ten years and life imprisonment, that certain factors could increase his sentence, that he could be responsible for the amount of drugs attributed to his co-conspirators and that could increase his sentence, and that he was waiving his right to appeal or collaterally attack his conviction. Petitioner further recalled that the Government had presented evidence against him and Molina at trial, including cash, guns and bags of methamphetamine, and that other plea deals had been offered before trial that required his cooperation as well as waiver of collateral attack. And finally, Petitioner admitted that all of the recorded conversations between him and his wife,

7

co-defendant Gary Heath, and Agent Garmin were in English.

The Government offered as witnesses Special Agent John Shannon and Mr. Kessler. Agent Shannon testified that he was the co-case agent with Agent Garmin, and that the investigation of these criminal proceedings involved multiple wiretaps. The Government offered a summary of phone conversations between Petitioner and his wife, Heath and Garmin, which were all in English.[16]

Mr. Kessler testified that he has been practicing law since 1974, and that a large part of his practice is devoted to criminal defense work. When he represented clients whose primary language was Spanish, it is Kessler's practice to use an interpreter if the defendant says he does not understand or prefers an interpreter or if it appears to him that the defendant is not understanding and that an interpreter could assist. Kessler was appointed to represent Petitioner at his first appearance before the magistrate judge in 2009 through his eventual plea and sentencing. Kessler testified that he visited Petitioner at least ten to twelve times at CCA, for thirty to sixty-minute sessions, and discussed the discovery provided by the Government, including transcripts of recorded conversations and photographs of evidence that implicated him. Kessler confirmed that Petitioner used an interpreter for all court proceedings, and that there was always an interpreter present for the numerous Spanish-speaking co-defendants who also appeared at various proceedings. In his private meetings with Petitioner, however, Kessler did not use an interpreter. Kessler explained that immediately after his appointment, he asked Petitioner if he needed an interpreter or a translator and Petitioner said no. Kessler recalled asking Petitioner on at least one later occasion if he needed an interpreter to help understand the

---

[16]Ex. 1.

discovery documents, and Petitioner indicated that he did not and that he could understand and discuss what Kessler was going over with him. Kessler discussed the total drug amounts that might be ascribed to Petitioner, that those drug amounts might result in a life sentence, and that if he did not cooperate he would receive a substantial sentence, somewhere between thirty years to life. Kessler testified that Petitioner's questions about and reactions to the discussion were relevant and appropriate, and that there was never any indication during his discussions about evidence, the offers to plea before trial, the Plea Agreement or otherwise that Petitioner did not understand what Kessler told him or that they were not communicating.

With respect to the plea offers before trial, Kessler confirmed that each offer extended included an appellate and collateral attack waiver provision, which he discussed with Petitioner, and which he thought Petitioner understood. Kessler testified that the Court also went over the waiver at the plea hearing, at which time an interpreter was used. Kessler further verified that any sentencing reduction in the plea offers extended before trial were largely dependent upon Petitioner's cooperation, specifically his truthful and complete information and testimony about co-defendant Rito Vazquez-Garcia , which could have resulted in the Government filing a § 5K1.1 motion under the Sentencing Guidelines. Kessler also clarified that one of the draft plea offers before trial did not require or anticipate cooperation by Petitioner, but that offer did not recommend any specific sentence and contemplated a Guideline sentence.[17] E-mails between Kessler and the Government also mentioned the possibility of a plea pursuant to Fed. R. Civ. P. 11(c)(1)(C) with a sentence ranging from 20 to 35 years, but the proposals were not formalized.[18]

---

[17]Doc. 465-1, Kessler Affidavit to Supplement Testimony.

[18]*Id.*

9

Petitioner would not agree to cooperate and rejected all plea offers prior to trial, including those that did not require cooperation. Kessler testified that when cooperating co-conspirators gave a statement, he would discuss with Petitioner the debriefings, notes, and discovery he received, and recommended during the course of the various offers that Petitioner accept the plea and cooperate. Although none of the offers included a binding sentence, Kessler discussed with Petitioner the possible sentence he would receive, depending upon the value of the assistance he provided.

Kessler recalled that after several days of trial, which included testimony adverse to Petitioner, Petitioner asked him about a plea, and Kessler then approached the Government. Kessler denied Petitioner's allegation that he told him a life sentence was extremely unlikely if he entered into the plea, and that instead, he told Petitioner that the argument for a lower sentence would be stronger if Petitioner plead guilty. Kessler testified that he explained to Petitioner that his leadership role might enhance his sentence as well as the role that relevant conduct would have on his sentence. Although he could not recall specifically discussing the effect possession of firearms would have on his sentence, Kessler denied that he led Petitioner to believe that dismissal of those counts would eliminate firearms from consideration in determining his sentence. Kessler denied Petitioner's allegation that he requested an interpreter prior to entering the Plea Agreement and testified that he would have provided an interpreter had Petitioner requested one, noting that two interpreters were present in court that morning, ready for trial to start. Kessler conceded that the agreement was never read to Petitioner in Spanish until the plea hearing, but that Petitioner had indicated to Kessler that he understood the terms and conditions of the agreement. Kessler stated that he did not feel pressured or rushed when

discussing the agreement with Petitioner and that the plea he entered into was very similar to the prior offers, without the cooperation requirement, and allowed the parties to argue sentencing. Kessler confirmed that during the plea colloquy with the Court, there was nothing discussed regarding sentencing exposure or factors that he had not already discussed with Petitioner. Kessler testified that he specifically discussed with Petitioner how the Guidelines applied, as well as the factors that could raise or lower the adjusted offense level. Although Kessler explained the law and thought that Petitioner understood, Petitioner did not agree that he should be found a leader of the conspiracy or held responsible for drugs possessed by co-conspirators. Kessler confirmed that he had listened to the conversations between Petitioner and his wife, Gary Heath, and Agent Garmin, and that all of them were in English. Although he knew there were large amounts of drugs involved in the case, Kessler testified that he did not think it was more than likely that Petitioner would receive a life sentence, but thought it more likely he would receive a sentence of twenty to thirty years.

**II.     Legal Standards**

Under § 2255(a):

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

According to Rule 4(b) of the Rules Governing Section 2255 Proceedings for the United States District Courts:

> The judge who receives the motion must promptly examine it. If it

> plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion. . . .

An evidentiary hearing must be held on a § 2255 motion "unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief."[19] Petitioner must allege facts which, if proven, would warrant relief from his conviction or sentence.[20] An evidentiary hearing is not necessary where the factual allegations in a § 2255 motion are contradicted by the record, inherently incredible, or when they are conclusions rather than statements of fact.[21]

A district court may grant relief under § 2255 if it determines "that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack."[22] "Review under § 2255 is not an alternative to appellate review for claims that could have been presented on direct appeal but were not."[23] A movant may overcome this procedural bar by showing either of "two well recognized exceptions."[24] First, the movant must show good cause for not raising the issue earlier and actual prejudice to the movant's defense if the issue is not

---

[19] 28 U.S.C. § 2255(b).

[20] *See Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir. 1995), *cert. denied*, 517 U.S. 1235 (1996).

[21] *Arredondo v. United States,* 178 F.3d 778, 782 (6th Cir. 1999) (quoting *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995)); *see also Hatch*, 58 F.3d at 1471 ("the allegations must be specific and particularized, not general or conclusory"); *United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (rejecting ineffective assistance of counsel claims which are merely conclusory in nature and without supporting factual averments).

[22] 28 U.S.C. § 2255.

[23] *United States v. Magleby,* 420 F.3d 1136, 1139 (10th Cir. 2005), *cert. denied,* 547 U.S. 1097 (2006).

[24] *United States v. Cervini,* 379 F.3d 987, 990 (10th Cir. 2004), *cert. denied,* 544 U.S. 904 (2005).

considered.[25] Cause may "be established by showing that counsel rendered constitutionally ineffective assistance."[26] Second, the movant must show the "failure to consider the federal claims will result in a fundamental miscarriage of justice."[27]

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."[28] A successful claim of ineffective assistance of counsel must meet the two-pronged test set forth in *Strickland v. Washington*.[29] First, a defendant must show that his counsel's performance was deficient in that it "fell below an objective standard of reasonableness."[30] To meet this first prong, a defendant must demonstrate that the omissions of his counsel fell "outside the wide range of professionally competent assistance."[31] This standard is "highly demanding."[32] Strategic or tactical decisions on the part of counsel are presumed correct, unless they were "completely unreasonable, not merely wrong, so that [they] bear no relationship to a possible defense strategy."[33] In all events, judicial scrutiny of the adequacy of attorney performance must be strongly deferential: "[A]

---

[25]*Id.*

[26]*United States v. Wiseman,* 297 F.3d 975, 979 (10th Cir. 2002) (citations omitted).

[27]*Cervini,* 379 F.3d at 990 (quoting *Coleman v. Thompson,* 501 U.S. 722, 750 (1991)); *see Bousley v. United States,* 523 U.S. 614, 621–22 (1998) (holding that a showing of actual innocence meets the fundamental miscarriage of justice prong).

[28]U.S. Const. amend. VI; *Kansas v. Ventris*, 556 U.S. 586 (2009).

[29]466 U.S. 668 (1984).

[30]*Id.* at 688.

[31]*Id.* at 690.

[32]*Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).

[33]*Fox v.Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000) (quotation and citations omitted).

court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[34] Moreover, the reasonableness of the challenged conduct must be evaluated from counsel's perspective at the time of the alleged error; "every effort should be made to 'eliminate the distorting effects of hindsight.'"[35]

Second, a defendant must also show that his counsel's deficient performance actually prejudiced his defense.[36] A defendant must demonstrate both *Strickland* prongs to establish a claim of ineffective assistance of counsel, and a failure to prove either one is dispositive.[37]

### III. Discussion

Although Petitioner waived his right to appeal or collaterally attack his sentence in his Plea Agreement, such a waiver "does not waive the right to bring a § 2255 petition based on ineffective assistance of counsel claims challenging the validity of the plea or the waiver."[38] Accordingly, the Court discusses each of Petitioner's claims in turn.

#### A. Plea Negotiations

The Supreme Court has recently issued two decisions addressing the question of ineffective assistance of counsel with regard to a defendant's rejection of a plea agreement. In

---

[34]*Strickland*, 466 U.S. at 689.

[35]*Edens v. Hannigan*, 87 F.3d 1109, 1114 (10th Cir. 1996) (quoting *Strickland*, 466 U.S. at 689).

[36]*Strickland*, 466 U.S. at 687.

[37]*Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000) (quoting *Strickland*, 466 U.S. at 697) ("The performance component need not be addressed first. 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'"); *see also Romano v. Gibson*, 239 F.3d 1156, 1181 (10th Cir. 2001) ("This court can affirm the denial of habeas relief on whichever *Strickland* prong is the easier to resolve.").

[38]*United States v. Cockerham*, 237 F.3d 1179, 1187 (10th Cir. 2001).

*Missouri v. Frye*, the Court recognized that the right to effective assistance of counsel extends to the plea bargaining process, and held that counsel's failure to inform his client of a plea offer may constitute ineffective assistance of counsel.[39] In *Lafler v. Cooper*, the defendant went to trial rather than accept a plea deal as a result of ineffective assistance of counsel during the plea negotiation process.[40] The defendant received a substantially more severe sentence at trial than he likely would have received by pleading guilty.[41] The Court held that the proper remedy to cure the ineffective assistance of counsel was to order the prosecution to re-offer the plea agreement and allow the state trial court to ". . . exercise its discretion in determining whether to vacate the convictions and resentence respondent pursuant to the plea agreement, to vacate only some of the convictions and resentence respondent accordingly, or to leave the convictions and sentence from trial undisturbed."[42] To prevail under the standard set forth in these cases, a petitioner must establish that counsel provided ineffective assistance in regard to petitioner's decision to reject the offered plea agreements and that, but for the ineffective assistance, there is a reasonable probability that the result would have been different.[43] More specifically, to establish prejudice in the context of a decision to reject a plea bargain, a petitioner must establish

> [A] reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted

---

[39] 132 S. Ct. 1399, 1408, 1410-11 (2012).

[40] 132 S. Ct. 1376, 1386 (2012).

[41] *Id.*

[42] *Id.* at 1391.

[43] *Id.* at 1384; *Frye*, 132 S. Ct. at 1409.

15

its terms, and that the conviction or sentence, or both, under the
offer's terms would have been less severe than under the judgment
and sentence that in fact were imposed.[44]

This case arises in a different context from that addressed in *Frye* and *Lafler*, as Petitioner does not contend that he was uninformed of the plea agreement offers or that he was given incompetent advice to reject the offers and proceed to trial. Instead, Petitioner argues that during initial plea negotiations, the Government offered him a fourteen-year plea deal that did not require his cooperation, which he rejected because Mr. Kessler ineffectively failed to explain to him the legal principle of co-conspirator liability and that he did not understand the evidence against him because of his inability to understand English.

After considering the testimony of the parties, the Court finds that Mr. Kessler's representation of Petitioner was objectively reasonable because he communicated the various plea offers, provided all relevant facts, and correctly conveyed to Petitioner the likelihood of his conviction and the consequences of proceeding to trial. Kessler communicated the Government's offers, including the offer that did not require Petitioner's cooperation, in a timely manner, and gave Petitioner advice that it was in his best interest to accept.[45] Indeed, the evidence shows that Mr. Kessler exceeded his responsibilities to Petitioner by continually urging him to accept the Government's plea offers, something Kessler was not required to do to meet the threshold of reasonableness.[46] Kessler was required to provide enough evidence and

---

[44]*Lafler*, 132 S. Ct. at 1385.

[45]*Cf. Frye*, 132 S. Ct. at 1408.

[46]*See Jones v. Murray*, 947 F.2d 1106, 1110 (4th Cir. 1991) (holding that while a criminal defense attorney is required to communicate a formal plea offer, provide all relevant facts, and discuss all potential alternatives, an attorney is under no obligation to recommend a particular course of action to a client).

explanation of the law to allow Petitioner to reach his own conclusions, and the Court finds that Kessler sufficiently communicated the relevant information. Once it became clear to Kessler that Petitioner understood conspiracy liability, but refused to accept it, Kessler was not constitutionally obligated to belabor the issue until Petitioner came to terms with the evidence against him and the likelihood of his conviction.

The Court rejects Petitioner's assertion that he did not understand what it meant to be a co-conspirator and that he asked for, but was not provided, an interpreter for meetings with counsel. On the contrary, the evidence at the hearing shows that Petitioner understood and spoke English well enough to conduct multiple drug transactions over the phone, and declined Kessler's offer to have an interpreter at the meetings outside of court.[47] Petitioner's claim that he did not understand the evidence against him is further belied by the fact that multiple co-defendants in this case needed Spanish-speaking interpreters and most, if not all, of the pre-trial hearings in this case involved not only Petitioner, but those co-defendants. Kessler adequately explained the Government's theory of liability and that Petitioner's only chance for a reduced sentence was by entering a plea and cooperating. Yet despite being informed of the options before him, Petitioner refused all offers to enter a plea before trial. That Petitioner was unwilling to accept the consequences of co-conspirator liability does not mean that Kessler inadequately explained it to him, nor does it render his conduct constitutionally unreasonable under the highly deferential performance prong required by *Strickland*.

The Court further finds that Mr. Kessler's conduct did not have a prejudicial effect on

---

[47]The Court notes that at one point during questioning by the Government at the April 15 hearing, Petitioner answered the prosecutor's question before the interpreter had a chance to pose the question to him in Spanish.

Petitioner's case. As discussed above, prejudice can only be established if the end result would have been more favorable to the defendant in the form of a lesser charge or a shorter sentence.[48] Petitioner has not credibly demonstrated that he held an intention to plead guilty prior to Mr. Kessler's alleged error that caused him to reject the Government's non-cooperation plea offer. In fact, the record shows that Petitioner consistently rejected *all* offers before him, and the only offers that might have resulted in a fourteen-year sentence required Petitioner's cooperation. Even assuming Petitioner would have accepted the offer that did not require his cooperation, that offer clearly did not include any chance of a reduced sentence or § 5K1.1 motion. Thus, Petitioner fails to satisfy his burden under the second prong of *Strickland*, and his motion is denied on these grounds.

### B. Waiver

Petitioner ultimately entered into a Plea Agreement with a provision waiving his right to collaterally attack or appeal his sentence. Petitioner claims that Mr. Kessler ineffectively failed to explain the waiver of his appellate rights and he did not understand the waiver when he entered his plea. Petitioner requests the Court reinstate his appellate rights. Petitioner's claim fails both prongs of *Strickland*.

First, the Court does not find credible Petitioner's testimony that Mr. Kessler failed to discuss the waiver provision with him before he entered the plea. The record shows that Petitioner received a number of plea offers before trial, all of which contained the standard waiver provision, and the Court does not accept Petitioner's allegation that Kessler failed to

---

[48] *Frye*, 132 S. Ct. at 1409.

explain the waiver in connection with any of these offers. Second, even if true, Petitioner suffered no prejudice as a result of this failure because the plea colloquy sufficiently informed him of the rights he was waiving and ensured that his waiver of those rights was knowing and voluntary.[49] In fact, the Tenth Circuit in the direct appeal found that both the plea colloquy and the plea agreement indicate that Petitioner was informed of his appeal waiver and that he knowingly and voluntarily accepted it.[50] Petitioner has offered no new evidence to require a different analysis here, nor has he identified a meritorious issue that he could have raised on direct appeal. Therefore, any failure of counsel to explain the waiver of his appellate rights did not affect the plea process, and Petitioner has failed to meet the requirements of *Strickland* with this allegation.

## IV.  Certificate of Appealability

Effective December 1, 2009, Rule 11 of the Rules Governing § 2255 Proceedings requires the Court to grant or deny a certificate of appealability ("COA") when making a ruling adverse to the petitioner. "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[51] A petitioner may satisfy his burden only if "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[52] A petitioner is not required to demonstrate that his appeal will

---

[49] Doc. 391, Tr. Plea Hrg.

[50] *United States v. Rubio-Ayala*, 435 F. App'x 755, 758 (10th Cir. June 23, 2011).

[51] 28 U.S.C. § 2253(c)(2). The denial of a § 2255 petition is not appealable unless a circuit justice or a circuit or district judge issues a certificate of appealability. *See* Fed. R. App. P. 22(b)(1); 28 U.S.C. § 2253(c)(1).

[52] *Saiz v. Ortiz*, 393 F.3d 1166, 1171 n.3 (10th Cir. 2004) (quoting *Tennard v. Dretke*, 524 U.S. 274, 282 (2004)).

succeed to be entitled to a COA. He must, however, "prove something more than the absence of frivolity or the existence of mere good faith."[53] "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it."[54] For the reasons detailed in this Memorandum and Order, Petitioner has not made a substantial showing of the denial of a constitutional right, and the Court denies a COA as to its ruling denying his § 2255 motion.

**IT IS THEREFORE ORDERED BY THE COURT** that Petitioner Alfonso Rubio-Ayala's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody (Doc. 441) is DENIED; Petitioner is also denied a COA on this ruling.

**IT IS FURTHER ORDERED** that the Government's Motion to Supplement Record (Doc. 465) is GRANTED.

**IT IS SO ORDERED**.

Dated: May 15, 2014

                                                   S/ Julie A. Robinson
                                                   JULIE A. ROBINSON
                                                   UNITED STATES DISTRICT JUDGE

---

[53]*Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003).

[54]*Id.* at 336; *see also United States v. Silva*, 430 F.3d 1096, 1100 (10th Cir. 2005).